# JAMES P. CRAIG

## *v.*

## THE PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*

## HARVEY NEVILL.

1. CHANCERY PROCEDURE—*dissolving injunctions.* Where defendants in a bill in chancery move to dissolve an injunction, and such motion is overruled, and they then answer the bill, they cannot assign the overruling of their motion as error.

2. SAME—*amendments.* It is the practice of courts of chancery to allow amendments to a bill before an answer is filed, and in many cases after, and before a replication is filed; the court in its discretion may allow amendments at any time.

3. SAME—EXCEPTIONS—*proceedings after exceptions.* Where exceptions taken to an answer are sustained, the proper practice is to take a rule upon the defendants to file a further answer within such time as the court shall direct; and upon failure to comply with the rule to take the bill as confessed.

4. CHANCERY PLEADING. Where an answer sets up a justification of the acts complained of, but does not show by virtue of what right, title or authority the defendants performed those acts, exceptions are well taken.

5. So where an answer sets up matters of law instead of matters of fact, exceptions are well taken.

6. CHANCERY JURISDICTION—*in cases of purpresture.* Where an injury of a public nature is threatened, as the inclosure of a highway, whereby public travel is in danger of being interrupted, and thereby great numbers of the citizens subject to petty loss and annoyance, by reason of such obstruction, a resort to chancery is proper, and is more effectual than the remedy at law.

7. PLANK ROADS—*public highways.* Plank roads are undoubtedly public highways, and differ from common highways in the mode of construction, and the taking of tolls, and on the payment of the latter travellers have the same right to use them they have to use other highways.

8. SAME—*closing up against the public.* Where a plank road has been used for a number of years by the public, and the company have used a portion of a public highway as their roadway, causing the public road to be closed up to divert travel to their road, they cannot close up their road against the public.

9. SAME—*selling to the county.* The provisions of the statute in relation to the selling of plank roads to counties, on the expiration of the charter of the

road, does not confer any authority on the company to close up such road until the county purchases.

10. SAME—*forfeiture or abandonment of charter.* Where the company forfeit their charter, or abandon it, or suffer the road to so become out of repair as to amount to an abandonment, the right of way of the company ceases and the road becomes a common highway.

11. SAME—*abandonment.* So where the lessees or assignees of a company publish a notice, that owing to the bad condition of the road, the high price of materials and labor, they cannot profitably keep up the road at the prescribed tolls, and that unless the county bought their entire interest to roadway, bridges, plank, toll gates, &c., the road would be closed up as private property : *Held,* that such notice was in effect an abandonment of the road, and that it became a common highway.

APPEAL from the Circuit Court of Randolph county; the Hon. SILAS L. BRYAN, Judge, presiding.

The facts of this case fully appear in the opinion of the court.

Mr. THOMAS G. ALLEN, for the appellant.

Mr. HARVEY NEVILL, for the appellees.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

We pass by several minor questions raised on this record, and come at once to the only one important in the case, and that is, can a plank road company abandon its franchise, and obstruct any part of the road, without any default on the part of the public, and without the authority of the legislature ?

This is an interesting question, not elucidated by any decided cases cited on either side, and must be determined on principle.

The history of this case would appear to be this : On the eleventh of February, 1853, the general assembly of this State passed an act to incorporate the Randolph County Plank Road

Company, by the eleventh section of which it was provided, that the county court of that county might, by an order to be entered of record, authorize the company to use, for the construction of the road, any of the public highways of the county. The main track of this road was from Chester, the county seat, to Sparta, with a branch at Randolph to Steelville, to be completed in five years. The charter was for twenty years, and the affairs of the company were to be managed by five directors. The county court, in August, 1853, entered an order allowing the company to use any of the public highways in the county for the construction of the road.

In February, 1854, the legislature amended the original charter, by providing penalties against those who should shunpike, and repealed that portion of the charter which required the road to be completed in five years, and it authorized the company to borrow money and mortgage the road for security.

The company organized, and constructed the road to Randolph, about seven miles from Chester. At this time there was but one public highway from Chester to Randolph, and the plank road, at several places, was constructed on this highway. The consequence was, the old highway throughout its length, from Randolph to Chester, was neglected, became impassable, and in some instances the adjoining owners of the land enclosed it.

In February, 1859, the general assembly passed an act concerning this plank road company, by which the president and directors were authorized to sell at public sale the road, roadbed, right of way, bridges, &c., franchises or other property.

The second section authorized the county court of Randolph county, to purchase at private sale, provided a majority of the legal voters of the county should petition therefor. To this section there is this further proviso : " that until said president and directors shall sell said plank road and other property and franchises, the same shall be and remain the property of the said president, directors and company, their successors and

62—47TH ILL.

assigns forever, or until abandoned by them, they keeping the same in good repair and condition to be traveled over, any limit or thing in their original franchise to the contrary notwithstanding."

Section four provided that the purchasers should be deemed the successors of the company, and should enjoy the rights, privileges and immunities granted in the original charter, with the additional power of increasing the rate of tolls fifty per cent. between the first day of November and the first day of April of each year.—Sess. Laws 1853, p 417.

Under the authority of this act, the company sold the road, franchises, toll-gates and bridges, and right of way, with all privileges and appurtenances of every kind, to John Swanwick, and conveyed the same to him by deed duly executed.

From the time this seven miles of the road was constructed, in 1854, the people of the county and traveling public had no other road to the point named, in the direction of Sparta, to travel upon, and it had become indispensable to them.

About the third day of January, 1868, the appellants published in the Randolph County Democrat, and other newspapers in the county, a notice that in consequence of the high price of material and labor, and the growing bad condition of the road, they had resolved to cease making further expenditures upon it, and also to cease taking tolls thereon, from and after the first day of February, 1868, and that the public would be permitted to pass over the roadway and the bridge across Gravel Creek, until the first of April, 1868, with the intimation that at that time, if their right and title should not be purchased for and on behalf of the public, the bridge, and that part of the road belonging in fee to them, would be no longer open to the public, but would be enclosed, and held and used as other private property, exclusively by them, the owners thereof.

In February, 1868, a bill was filed by the States Attorney of the proper judicial circuit, verified by the oath of Harvey Nevill, then county judge of Randolph county, against.

appellants, setting forth these facts, and praying that appellants might be enjoined and restrained from enclosing the road or bridges so as to interfere with the free use of the same by the public, or in any wise meddling with the road, or the bridges, dykes, embankments, culverts, &c., belonging to the road, for any other purpose than might be necessary for making needful repairs and collecting the tolls, and for general relief.

Appellants having been duly served with process, appeared at the April term, 1868, and entered their motion to dissolve the injunction. This motion was denied, and leave was given complainant to amend the bill, to all which the defendants excepted.

The material amendment consisted in adding to the charging part of the bill, these words : " so that if the threats hereinafter made by defendants should be executed, travelers on said road thereafter would be subject to irreparable annoyance and injury, and such obstruction of said plank road would be a public nuisance ; and there is no bridge across the stream on or near said bridge across Gravel Creek, threatened to be closed up."

A rule being taken for that purpose, the defendants filed their answer to the bill as amended, admitting the grant of the charter, the order made by the county court authorizing the use of any of the public highways of the county on which to construct the plank road, the amendment of the charter in February, 1854, the organization of the company and the construction of the road from Chester to Randolph; admits there was but one public highway from Randolph to Chester, and that the plank road was laid over it in a few places, and avers that not so much as one-half mile of this public highway was used or covered by the company in the construction of the plank road, and that more than six-sevenths of the entire length of the plank road from Chester to Randolph, was constructed on and over land which was, and is, private property, and never dedicated, or otherwise lawfully appropriated to

the public for a public highway. They also deny that the public highway from Randolph to Chester has ever been legally vacated by any order of the county court of Randolph county, or otherwise, and they aver that it is open in several places, and used and traveled over by the public, and if any part of it has been enclosed, it has been wrongfully done, and without authority of law, and if it has become out of repair, that it is the fault and neglect of the public authorities; and they also deny that the threatened obstruction is a nuisance.

The answer was sworn to, and several exceptions taken thereto, which were sustained by the court, and leave given defendants to amend their answer. Having declined to amend, and standing by their answer, the cause was heard on the amended bill, answer, and, as the record states, "exceptions to the answer," and the injunction was made perpetual.

To reverse this decree, this appeal is taken, and it is assigned as error, refusing the motion to dissolve the injunction, allowing complainant to amend the bill after having refused defendants' motion to dissolve the injunction, in sustaining complainants' exceptions to the answer, and in making the injunction perpetual.

As to the first error assigned, it is sufficient to say, that defendants waived all advantage of their motion by putting in an answer to the bill as amended. The motion was in the nature of a demurrer to the bill, and the answer was in the nature of a plea, and, on general principles, filing a plea waives a previous demurrer. As to the propriety of allowing the amendment nothing can be clearer, and it is the constant practice of courts of chancery to allow amendments, certainly before answer filed, and, in many cases, after, and before a replication is filed. *Droullard* v. *Baxter*, 1 Scam. 191. And the court, in its discretion, may allow amendments to a bill at any stage of the cause. *Jefferson Co.* v. *Ferguson*, 13 Ill. 33. And, generally, in the discretion of the court. *McArtee* v. *Engart*, ib. 243; *Marble* v. *Bonhotel*, 35 ib. 240. As to third

error, that of sustaining complainants' exceptions to the answer, and giving leave to amend the answer, the proper practice undoubtedly was, to take a rule upon the defendants to file a further answer within such time as the court should direct, and, on failure thereof, the bill should be taken as confessed. Ch. Code § 22. As to the exceptions themselves, several of them were well taken, and those quite material, especially the fifth, as the answer does not show that the defendants claim the road as their private property under Swanwick, to whom the plank road company had sold and conveyed it. There is nothing in the answer showing any right or title to this road in the defendants, nor is there any averment that they, in what they proposed to do, were acting as the agents of such purchaser, or by his authority, nor, if it was their private property, do they show any right to deprive the public of its use; and, besides this, the parts of the answer excepted to, set up questions of law instead of facts, which is not allowed. The answer should state facts only. *Stone* v. *Moore*, 26 ib. 165.

The answer having been adjudged insufficient, and leave given, and not accepted, to amend the answers, which would include the filing a good and sufficient answer, the cause was heard on the bill and answer. The important question now arises, could the court, on the facts admitted, make the injunction perpetual?

This involves an inquiry into the nature of these plank roads, constructed under the general law, or by special charter. Are they public highways? That they are, cannot be denied, the material difference between them being in the manner and mode of construction and repairing, and the fact that the travelling public pay a toll for their use. Travellers have as much right to use the one as the other, on paying the specified tolls. They are constructed for the convenience of the public, in the hope of profit to their proprietors, it is true, yet, for a public purpose, and we are inclined to hold, when

such a road is made, and has, for a series of years, been used by the public as a thoroughfare, the corporators have no right, by acts of their own, to deprive the public of the use of any part of it, the more especially if it has been constructed on the route of a public road, using such road, or any part of it, for its roadway and superstructure. Certainly not, if, by the construction of the plank road, the travel has, by being turned on to the plank road, caused the public highway to fall into disuse, and to such a degree as to occasion the occlusion of it by the owners of the land over which it ran. The least that could be demanded of the proprietors of a plank road so circumstanced, would be, if they had an independent right to close their road, and shut out the public from the use of the bridges upon it, that they should restore the old highway to its pristine condition, making it as useful to the public as it was prior to the construction of their road.

But we deny any right on the part of such corporators to close their road, under the circumstances of this case, to the use of the public. Whence is the right derived? Appellants say, by the revenue laws, plank roads and their appurtenances are deemed real estate, and liable to taxation as such. This is saying no more than this, that owners of real estate shall pay the taxes assessed upon it. They also say, by the fourth section of the act of February 1, 1851, it is provided, at the expiration of the corporate existence of any plank road company, by expiration of their term fixed by its articles of association, if the road has been constructed upon any public highway or street, the county in which the road is situated shall pay the company the value of the plank superstructure at the time of the expiration, and the same if constructed under a charter.

This is wise and just legislation, and there can be no doubt, on the expiration of the charter of this company, the county authority, of Randolph county, will pay the value, then to be ascertained, of this superstructure, but it by no means follows,

although the county is under this obligation, that unauthorized individuals, of their own willfulness, may shut up the road and deprive the public of its use. Such a power being claimed, it is requisite the clearest evidence of its existence should be shown. It does not exist in the nature of the thing itself, and must be clearly established. This has not been done and cannot be done. The public have lawfully obtained an easement over this line of road, and no power short of the legislature can deprive them of it.

This plank road was, unquestionably, a public highway. By the act of constructing it and opening it for use, and being used, on payment of tolls, it was as emphatically dedicated to the public as it could have been by a deed of dedication, acknowledged and recorded. The elements of a complete dedication are found in the permitted use of the road by the public, and building it for such purpose, and the subsequent use of it by the public without denial or interruption. The very purpose of constructing the road carries with it, when constructed, a dedication. This being so, it would be unjust, in view of the privilege granted, that the parties, finding it not remunerative, should, on the strength of a claim that the road is private property, suddenly close it up and deprive the public of its use. Ruinous would be the consequences of such a power; but the power does not exist. Suppose the franchise had become forfeited, can there be any doubt, especially after office found, that the road would belong to the public? We think not. In case of abandonment of the road, on failing to keep the same in good repair and condition to be travelled over, which might be equivalent to an abandonment, the second section of the act of 1859, impliedly concedes that the road would belong to the public. Was not the notice published by appellants in the newspapers of the county, on the presumption that they were the rightful owners of the road, in effect and spirit, an abandonment of the road? We can

make nothing less of it. This being so, the rights of the public over it become in full force and supreme.

Now, as to the remedy by injunction. It is true, an action at law would lie against these appellants, should they obstruct the road, and also for continuing the obstruction after notice to remove it. But this remedy, on the facts before us, would not only be tardy, but wholly inadequate. Intercourse between the settled portions of the county and the county seat would be almost wholly interrupted, the citizens put to great inconvenience, and injuries inflicted, which, though in particular cases might be trifling, yet in the aggregate would be too grievous to be borne. It would be a monstrous public nuisance, to prevent which full power is lodged in a court of chancery, by calling into exercise its restraining power. With that powerful arm the whole wrong can be at once grasped, and the injury prevented. It is the most effective remedy. *Green* v. *Oakes*, 17 Ill. 249. And, as this court said in the case of *The People* v. *The City of St. Louis*, 5 Gilm. 373, which was an attempt to obstruct the eastern channel of the Mississippi river, in this State, by the authorities of St. Louis, that the chancellor had no discretion to refuse the injunction, but was bound to grant it, as the nuisance could never be abated, and the public rights to that channel could never afterwards be enjoyed. It is true, the nuisance here threatened is not of that permanent character as the proposed closing of the channel of the Mississippi river; though those obstructions could be removed and the channel again opened, but the principle is, that any acts of the character here indicated, by which the public may be put to great expense and exposed to much injury, parties doing them, or threatening them, may be restrained by injunction.

As to the objection that an improper party is made complainant, we see nothing in that. The County Judge is the complainant, and he is a proper person to call in the aid of chancery. The decree must be affirmed.

*Decree affirmed.*