HENRIETTA SNELL *et al.* Admr. etc.

*v.*

THE CITY OF CHICAGO *et al.*

*Filed at Ottawa May 14, 1890.*

1. CORPORATIONS—*essential elements.* The essence of a corporation consists in a capacity, first, to have perpetual succession under a special name in an artificial form; second, to take and grant property, contract obligations, sue and be sued by its corporate name as an individual; and third, to receive and enjoy, in common, grants of privileges and immunities. The first two describe the franchises which belong to the corporators; the last, those which belong to the corporation.

2. SAME—*period of duration.* Where the legislature, before the adoption of the present constitution, by a private act, constituted certain corporators a body corporate and politic, under a given name and style, and provided that by that name they should have perpetual succession, and the right to sue and be sued, it was *held*, that the grant of perpetual succession was an incorporation for an unlimited period of time, and that so long as the corporation lasted it could exercise the powers conferred upon it.

3. SAME—*plank road charter of February 12, 1849—constitutionality—one subject, and that to be expressed in the title.* February 12, 1849, the legislature passed an act entitled "An act to construct a plank road from Oswego, in Kendall county, to the Indiana line, by way of Joliet, Will

county." Sections 21 and 22 authorized the Northwestern Plank Road Company to "construct a plank road from the city of Chicago to Oak Ridge, and from thence to Wheeling and to the north line of Cook county:" *Held,* that those sections were in conflict with section 23 of article 3 of the constitution of 1848, which provides that "no private or local law * * * shall embrace more than one subject, and that shall be expressed in the title," and conferred no rights or powers whatever.

4. SAME—*sale of franchise and property—priority of right to buy— under a statute.* An act amendatory of the charter of a plank road company provided that the supervisors of the county might purchase the franchise, property and immunities, "and should said county fail to purchase the same, any person or persons may purchase the same and thereby make the same private property:" *Held,* that the object was to give the county the prior right to purchase, and the right of others to purchase was conditioned upon the failure of the county to purchase. In such case, the county could not be said to fail to purchase without notice to it of the resolution of the company to sell.

5. SAME—*sale of franchise, etc.—as working a dissolution of the corporation.* It is a general rule, that when the charter of a corporation, or its franchise to be a corporation, is transferred or sold, there is a surrender or abandonment of the old charter by the corporators. The effect of such a sale or transfer is the same as though the old corporation was dissolved and its franchise surrendered to the State.

6. An act amending the charter of a plank road company authorized the president, by the advice and direction of a majority of the stockholders, to sell the "property and immunities" of the company to Cook county, if its debts were all paid, or to any other party or parties, and thus dissolve said company and divide the avails among the stockholders: *Held,* that the legislature intended that a sale, when made, should operate to dissolve the corporation.

7. SAME—*sale of franchise, etc.—in what the franchise consists—power to make a transfer of it—and of the rights which accrue to the purchaser.* The right of persons to become a body corporate, with right of perpetual succession, is the franchise of the corporators; and where the same act granting this gives the corporate body the right to construct and maintain a toll-road and build toll-houses and collect tolls, these will be franchises of the corporation. The former franchise,—that is, the franchise to be a corporation,—can not be transferred without express provision of law pointing out the mode in which the transfer is to be made.

8. Where a corporation is expressly authorized by law to sell and convey its franchise, immunities and property, and the mode of sale is defined, and such sale is made as directed, then, although the word "franchise" in the law is broad enough to include the franchise to be a

corporation, with the power of perpetual succession, yet the purchaser will not thereby be made a corporation under the old charter, but he will merely be vested with the right to organize as a corporation.

9. The franchise of becoming and being a corporation in its nature is incommunicable by the act of the parties, and incapable of passing by assignment, or by the law of descent.

10. An amendment to the charter of a plank road company authorized the company to sell and convey its franchise and property, and provided that the purchaser should "enjoy all the rights and privileges enjoyed by said company, and no more:" *Held,* that this provision should be strictly construed in favor of the public and against the grantee of the privilege. No rights passed to the heirs of the grantee. A perpetual grant was not intended.

11. SAME—*sale of a part—under a power to sell the whole—as, of a plank road franchise, etc.* A legislative enactment giving to a plank road company the right to sell and convey its franchise, road, property, etc., does not authorize a sale and conveyance of a part, only, of the road constructed and operated, and such a sale and conveyance can not be regarded as binding on the State.

12. SAME—*purchaser of toll-road franchise, etc.—conditions to be fulfilled—restrictions as to change of location of toll-gates.* A charter to a plank road company required it to complete its road from the city of Chicago to Oak Ridge, from thence, by Wheeling, to the north line of the county. Only nine miles were built, and in 1870 the company, under legislative authority, sold its franchise and property to another, who continued to collect the tolls up to his death. The law authorizing the sale provided that the purchaser should be bound by all the obligations of the company : *Held,* that it was the duty of the purchaser to have completed the road, and that the payment of tolls did not relieve him of his duty in that respect, and that he had no right to change the location of the toll-gates established by his grantor.

13. Where a plank road company has once exercised the discretion or power vested in it to erect and maintain such toll-houses and gates as it may deem suitable to its interests, by locating the gates it will have exhausted its power, and can not afterward make a different location.

14. Tolls can only be collected at the legally established gates, and the public interested in the permanency of their location are entitled to the right of paying tolls at the established gates, especially when such payments have been made there for many years.

15. SAME—*toll-road company under special charter—made subject to general law—rights and restrictions resulting—collecting tolls in cities.* An amendment to a charter of a plank road company provided that such company "may collect the same tolls and enjoy the same privi-

leges granted to plank road companies by the general Plank Road law, and it may collect the same penalties," etc.: *Held,* that the company, by accepting the amendment, consented that thereafter its privileges should be no more or less than those granted from time to time under the general law, and this right and restriction passed to the purchaser of the franchise and property of the special corporation.

16. Such special plank road company, by accepting such amendment, became subject, not only to all general laws on the subject, but also subject to such general laws relating to plank roads and plank road corporations as might thereafter be enacted ; and section 12 of the act of 1874, which provides that "no toll-gate shall be erected or kept, or toll demanded, within the corporate limits of any incorporated city, or within one hundred and sixty rods of such limits," became applicable to such special company, and to its successor in interest.

17. SAME—*curative legislation—acts of corporation under a void charter—limitation of the power.* If the legislature, by a subsequent act, recognizes the corporate existence of a corporation which was organized under a void charter, and its right to act, and relieves such corporation of a condition imposed upon it by the invalid charter, and refers to its acts, the illegality of the corporate acts before performed will be cured by the subsequent law.

18. Section 3 of the act entitled "An act to incorporate the Northwestern Plank Road Company," which, after reciting that the corporators had organized and proceeded in the construction of the road under the void act of February 12, 1849, attempts to legalize and make valid the acts done in pursuance of such void act, is also in violation of such constitutional provision, as the legalization of unauthorized acts can not be regarded as germane to the object expressed in the title, and the section therefore did not validate the prior proceedings had under the prior special act.

19. CONSTRUCTION OF STATUTES—*words of permission—"may" to mean "shall"—as, in the charter of a corporation.* Words of permission in the charter of a corporation, if tending to promote the public benefit, are obligatory. And it is promotive of the public good that a plank road corporation organized under special acts shall not enjoy any greater privileges than other like corporations formed under a general law, and when the law says such special corporation "may enjoy" the same privileges as those awarded under the general law, it will be construed to mean "shall enjoy" the same privileges.

20. HIGHWAYS—*granting use to toll-road company—rights acquired.* An order of the county commissioners' court, prior to the present constitution, consenting to the appropriation of a public highway to a plank road company, merely vested in the company the right to use the highway for the purposes of its plank road.

21. Notwithstanding the appropriation of a public highway for a plank road, the public still has the right to use the same, such use being subject to the payment of tolls; and the right of the plank road company is the right to exact of the public a charge for the use of a mere easement or right of way over land.

22. SAME—*highway brought within a city—effect upon prior grant of use.* If the limits of a city are so extended as to include therein a part of a former public highway, the control of the county or township authorities over such highway will cease, and the city will thereafter be invested with the entire control of the same. The same result follows when a part of a highway so added to a city has been under the management of a toll-road company.

23. A plank road company and its vendee will be held to have accepted their charter upon the implied understanding that the right to use the highway for a toll-road shall give way as to such part thereof as may become subjected to the control and government of an incorporated city.

24. SAME—*of the fee—as to public roads, and streets.* The public has only an easement in a highway, while the fee remains in the owners of the land.

25. The fee in streets, however, is vested in the city in which they are situate, for the use of the public, and their free and untrammeled use belongs to the public. The streets can not be under the control of two different bodies.

26. SAME—*taxation by road authorities to improve street.* A tax levied by commissioners of highways for the repair or the improvement of a public road or street lying within the limits of a city is illegal.

APPEAL from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

This is a bill filed by the appellants who are the administrators of the estate of Amos J. Snell, deceased, and his children and heirs at law, against the appellees, the City of Chicago and George B. Swift, commissioner of the department of public works of that city, to enjoin the latter from removing a toll-gate and toll-house on Milwaukee Avenue at or near its intersection with Fullerton Avenue, and from interfering with the use thereof for the collection of tolls. The defendants below demurred to the bill; the demurrer was sustained and

the bill was dismissed. The present appeal is prosecuted from the decree dismissing the bill.

Appellants claim that, in his lifetime, Amos J. Snell was the owner through a conveyance to himself of the property, charter and franchises of a corporation known as the North-Western Plank Road Company, which controlled a toll road running northwesterly from the city of Chicago, and that they have become the owners thereof as his representatives and heirs.

The bill sets out in full the various acts of the legislature hereinafter referred to, which are alleged to constitute the charter of the company, and avers that the right to operate the road and collect the tolls is conferred by such acts. It is also alleged in the bill, that "under and by virtue of said acts for its incorporation the North-Western Plank Road Company became and was duly incorporated and organized as a corporation." It furthermore appears from the bill, that, by the terms of section 1996 of the Municipal Code of the City of Chicago, the owner of any building or other obstruction standing upon any street within the city, is required to remove the same within a certain time, upon receiving notice to do so from the commissioner of public works, under a penalty; that, upon petition of nine citizens and tax-payers, an order was made by the common council of the city directing the commissioner of public works to remove said toll-office or toll-gate building; that the commissioner caused to be served upon the complainants, or some of them, written notice to remove the building within five days under penalty for a violation of said section 1996.

On February 12, 1849, the legislature passed an act entitled "An Act to construct a plank road from Oswego, in Kendall county, to the Indiana line, by the way of Joliet, Will County," and, by Sections 21 and 22 of said Act, it was provided as follows:

"Sec. 21.    That John Gray, Joseph Filkins, Thomas Richmond and their associates, to whom was granted by the county

commissioners of Cook county a license to construct a plank road from the city of Chicago to Oak Ridge, and from thence to Wheeling, and to the north line of said county, be and they are hereby constituted a body corporate and politic, under the name and style of 'The North-Western Plank Road Company,' and by that name shall have perpetual succession, and the right to sue and be sued, together with all other rights and ordinary powers of a corporate body.

"Sec. 22.  That the said North-Western Plank Road Company shall have, possess and enjoy, and be subject to all the powers, privileges, rights and duties contained in sections 4, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18 and 19 of the act passed at the present session of the General Assembly, entitled 'An Act to incorporate the Chicago South-Western Plank Road Company,' and in addition thereto shall have the right to take and use for the purposes of constructing said road, any road or public highway along the line of the contemplated plank road, upon obtaining the order of the county commissioners' court of said county, to be entered of record, consenting to the appropriation of such road or highway,—which said order shall be made by said court upon the petition of three-fourths of the owners of the land lying along or contiguous to said highway,—which order, when obtained in manner aforesaid, shall vest the right to use said highway for the purposes of said plank road, as fully and completely as though said corporation had obtained the same by grant."

These two sections, 21 and 22, constitute the original charter of the company under which appellants claim.   "An Act to incorporate the Chicago, South-Western Plank Road Company," which is referred to in section 22, was approved February 10, 1849, (vide Private Laws of 1849, pages 70 and 57); section 4 thereof provides for a capital stock of $260,000.00 to be divided into shares of $50.00 each; section 7 provides that "the said corporation shall have power to erect and maintain such toll-houses, toll-gates and other buildings for the

accommodation and management of the said road and the travel and transport thereon, as the said corporation may deem suitable to its interests, and may demand, collect and receive of and from any and every person using said road, or so much thereof as may be completed, toll to be regulated by the directors of said corporation, but not to exceed the following rates per mile" (then follow certain specified rates); section 8 provides for keeping a list of the tolls upon each gate, and for detaining travellers until the payment of the toll, and that the corporation "shall cause mile posts to be erected and maintained on said road"; section 9 provides penalties against the company for unreasonably delaying travellers, or demanding more than legal tolls, and against those who shall injure the property of the company, or avoid the legal tolls or forcibly pass the gates; section 10 authorizes the corporation "to locate and construct said plank road over any lands owned by this State on the route of said road, and to acquire, by voluntary cession or purchase from the owners, the right to construct said road over any lands belonging to individuals, companies or corporations on said route, and * * * to appropriate and use so much of said land as shall be necessary for the proper construction of said road, on complying with the six following sections;" sections from 11 to 16 inclusive provide for condemnation proceedings; section 17 provides for the construction of lateral branches of the road; section 18 provides that the corporation, "in and about the prosecution of said road and to aid it therein, may borrow money," etc. * * * and may set apart a part of the profits "for the prosecution, repair and renewal of the said road," etc.; section 19 declares the Act to be a public act.

On March 1, 1854, the legislature passed an act entitled "An Act to incorporate the North-Western Plank Road Company." Sections 1 and 2 of this act of 1854 are the same as sections 21 and 22 of the Act of February 12, 1849, except that the first line of section 21 as above quoted is preceded by the

following words: "Be it enacted by the people of the State of Illinois represented in the General Assembly." The remainder of the act of 1854 consists of a preamble and of section 3. The preamble refers to the act of February 12, 1849, and to sections 21, 22 and 23 thereof, as constituting certain persons a body politic and corporate under the name of the North-Western Plank Road Company, and concludes as follows: "and whereas doubts exist whether this is in accordance with the constitution of this State, inasmuch as the title of the act of which this is a part, does not set forth this part of the act, nor the title of the company which is authorized under the name and style of the North-Western Plank Road Company; .therefore:"    Section 3 of the Act of 1854 is as follows:

"Sec. 3.    That whereas the corporators heretofore named did organize and proceed to prosecute the construction of such road under the powers referred to, all the acts of said corporators, done in accordance with the rights and provisions therein contained, in good faith, are hereby legalized and made valid, the same as if no defect in the title of the original act had existed.

"This act shall take effect from the date of its passage."

On February 15, 1865, the legislature passed the following act:

"AN ACT TO AMEND THE CHARTER OF THE NORTHWESTERN PLANK ROAD COMPANY, IN THE COUNTY OF COOK, AND TO AUTHORIZE THE SALE OF THE FRANCHISE.

"SECTION 1.  *Be it enacted by the People of the State of Illinois, represented in the General Assembly:*   That the North-Western Plank Road Company be authorized to substitute stone or gravel in place of plank, upon said road. or any part thereof: *Provided,* the same shall be of equal width of the plank track, and be constructed so as to pass the examination of the inspectors of plank roads in said county.

"Sec. 2.    The said company may collect the same tolls and enjoy the same privileges granted to plank road companies by

the general Plank Road law, and it may collect the same penalties, fines and damages for any violation of its rights or damage to its property that is authorized by said general law, and be subject to the same penalties that law imposes for abuse of travellers or the community.

"Sec. 3. The president, by the advice and direction of a majority of the stockholders, may sell to the county of Cook the franchise, the property and immunities of said company, or to any other party or parties, and thus dissolve said company and divide the avails amongst the stockholders.

"Sec. 4. And be it further enacted, that the board of supervisors of Cook county may purchase such franchise, property and immunities, and upon the order of said board the clerk of said county shall proceed to purchase and receive the deed of title to the same, and should said county fail to purchase the same, any person or persons may purchase the same, and thereby make the same private property.

"Sec. 5. The deed of the president of said company, to the said county of Cook, or to any other party purchasing, shall be a good and lawful title to the same: *Provided, always,* that all the debts and liabilities of said company shall be paid: *Provided further,* that the purchaser or purchasers of said franchise and road shall be bound by all the obligations said North-Western Plank Road Company is by its charter, and shall enjoy all the rights and privileges enjoyed by said company, and no more."

The bill then avers that the following deed, dated August 5, 1870, and recorded August 6, 1870, in the recorder's office of Cook County was executed by the president of said corporation to Amos J. Snell, to wit:

"Whereas, the North-Western Plank Road Company was made a corporation by an act of the legislature of the State of Illinois, entitled 'An act to incorporate the North-Western Plank Road Company,' approved March 1, 1854. And where-

as, an act to amend the charter of the North-Western Plank Road Company in the County of Cook, and to authorize the sale of the franchise, was passed by the legislature of the State of Illinois, approved February 15, 1865, containing the following clauses, (here follow sections 3 and 5 of the act of 1865 as above set forth). And whereas, at a meeting of the stockholders, held at the president's room, 469 west Lake street, on the 5th day of January, 1866, and five thousand one hundred and twenty (5120) shares were represented, being all but eighty (80) shares, the following resolution was passed:

"*Resolved*, by the stockholders of this company, that Thomas Richmond, president, be authorized to sell the plank road, toll-houses and other property belonging to the company, with the franchise and all its rights and privileges, and give a deed of the same to the purchaser for such sum and upon such conditions as he shall deem advisable.

"And whereas, the said Plank Road Company is entirely free from debt:

"Now, therefore, I, Thomas Richmond, president of the North-Western Plank Road Company, for and in consideration of the sum of $20,000 to me in hand paid by Amos J. Snell, of Jefferson, in the county of Cook, and State of Illinois, do hereby sell, transfer, convey and set over to the said Amos J. Snell, his heirs, executors, administrators and assigns, 'all the property of said company, consisting of the charter and its amendments, and franchises, the right of way, the grading, the planking, ditches, bridges and drainages, the toll-house, gates, teams, implements of work, and being the plank road from the old city limits of Chicago aforesaid to the nine mile post, together with all the property, goods and chattels of said company, of whatsoever nature or description,' to have and to hold, unto the said Amos J. Snell, his heirs, executors, administrators and assigns forever."

Mr. Frank J. Crawford, and Mr. Sidney Smith, for the appellants:

The General Assembly has the same power to validate an irregularly organized corporate body, as it has to create a new one. *Mitchell* v. *Deeds*, 49 Ill. 416; *People* v. *Plank Road Co.* 96 N. Y. 1; Cooley's Const. Lim. chap. 11, p. 369, *et seq.*

A statute recognizing the existence of a corporation, and amending its charter, will cure defects in its formation. See *Jameson* v. *People*, 16 Ill. 257; *People* v. *Farnham*, 35 id. 562; *McAuley* v. *Railroad Co.* 83 id. 348; *People* v. *Hydraulic Co.* 115 id. 281.

The legislature had the power to authorize the sale of the franchise and property of the plank road company. *Turnpike Co.* v. *Ballard*, 2 Metc. 165; *Canal Co.* v. *Commonwealth*, 50 Pa. St. 407; *State of Ohio* v. *Sherman*, 22 Ohio St. 428; *Craig* v. *People*, 47 Ill. 487.

For definition of "franchise" by this court, see *People* v. *Holtz*, 92 Ill. 426.

The franchise constituted an irrevocable contract. It was valuable property, which could be taken only by condemnation.

The prohibition of the erection of toll-gates within the city should be construed with reference to the limits then existing, otherwise, by extending the city limits, the chartered rights of the company might be confiscated. *Cope* v. *Plank Road Co.* 37 Mich. 195.

The franchise in question authorizes the erection and maintenance of such toll-houses, toll-gates and other buildings, as its owner may deem suitable, etc. The power and discretion in this regard are as broad as language can make the same. Under this power, gates may be placed at any point reasonably necessary for the collection of toll, and their location may be changed as circumstances may require. *Fowler* v. *Pratt*, 11 Vt. 369; *Turnpike Co.* v. *Stephens*, 10 N. H. 133.

Mr. JONAS HUTCHINSON, Mr. M. W. ROBINSON, and Mr. ED-
WARD ROBY, for the appellees:

We suggest that the statutes recited in the bill, at the most,
are no more than mere license, revocable at any time, and
the charters of Chicago and extension of the limits were suffi-
cient to revoke them. *Rundell* v. *Canal Co.* 15 How. 80; *Snell*
v. *Buresh,* 123 Ill. 151; *Navigation Co.* v. *Koons,* 6 W. & S.
101; *Canal Co.* v. *Wright,* 9 W. & S. 9; *Fertilizing Co.* v. *Hyde
Park,* 97 U. S. 659.

The subject of a bill or act must be expressed in its title.
Const. of 1848, art. 3, sec. 23; *People* v. *Otis,* 74 Ill. 388;
*People* v. *Cooper,* 83 id. 588; *Lockport* v. *Gaylord,* 61 id. 279;
*People* v. *Inst. of Protestant Deaconesses,* 71 id. 233; *People* v.
*Mellen,* 32 id. 183; *Railway Co.* v. *Lake View,* 105 id. 207.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

Under recent Acts of the legislature a large area of new ter-
ritory has been annexed to the city of Chicago, so as greatly to
extend its boundaries.  A portion of the highway known as the
Milwaukee Road, upon which the toll-gate and toll-house in
question are located, was outside of the city limits prior to such
annexation, but thereafter, and by reason of the enlargement
of the city, the portion in question was taken into the city and
is now a part of the street called Milwaukee Avenue.  The effect
of this change upon the rights of the plank road company, or
its successors, is the subject presented for consideration.

Section 12 of the Act of March 25, 1874, "to revise the law
in relation to toll roads" (Rev. Stat. chap. 138) provides that
"no toll gate shall be erected or kept, or toll demanded, within
the corporate limits of any incorporated city, or within one
hundred and sixty rods of such limits."  Can this section be
enforced against the appellants so as to compel them to desist
from keeping a toll gate and demanding toll at the intersection
of Milwaukee and Fullerton Avenues in the city of Chicago?

Is there a contract existing between the State and appellants, which relieves them from the duty of obeying this requirement?

Unquestionably sections 21 and 22 of the Act of February 12, 1849, were unconstitutional and conferred no rights whatever. They provided for the organization of the "North-Western Plank Road Company" to construct a plank road from the city of Chicago to Oak Ridge, and from thence to Wheeling, and to the north line of Cook County," and were inserted in the body of an act whose title was "An Act to construct a plank road from Oswego in Kendall County to the Indiana line by the way of Joliet, Will County." This was a clear violation of that part of section 23 of Article 3 of the constitution of 1848, which provides that "no private or local law  *  *  *  shall embrace more than one subject, and that shall be expressed in the title."

It must also be held, upon the authority of *Village of Lockport* v. *Gaylord*, 61 Ill. 276, that section 3 of the Act of March 1, 1854, is unconstitutional. The title of the last named act is "An Act to incorporate the North-Western Plank Road Company." Section 3 thereof, after reciting that the corporators had theretofore organized and proceeded to prosecute the construction of the road under the void act of February 12, 1849, attempts to legalize and make valid the acts done in pursuance of such void act; the legalization of unauthorized acts can not be regarded as germane to the subject expressed in the title.

But we see no reason why sections 1 and 2 of the Act of 1854, which are literal copies of sections 21 and 22 of the Act of February 12, 1849, are not constitutional. These sections are prospective and not retrospective in their character. The rights and powers conferred by them are to be exercised in the future. It appears, however, from the allegations in the bill, that the corporators completed their organization under the license granted by the County Commissioners' Court of Cook County, and obtained from that Court the order consenting to the appropriation of the highway known as "Milwaukee Road,"

and afterwards called "Milwaukee Avenue," before the passage of the Act of March 1, 1854; also, that the company took and used said highway for the construction of the road before March 1, 1854. The bill does not aver that any of these acts were done, or that any of these proceedings were taken, after the passage of the Act of 1854, but proceeds upon the theory that they were legalized by the third section of that Act. Owing to the void character of said section 3 they were not so legalized.

But, by the Act of February 15, 1865, which was an Act to amend the charter of the North-Western Plank Road Company, the legislature recognized the corporate existence of the company, and also recognized the right of the Company to substitute stone or gravel for plank upon so much of the road as may have been then constructed without obtaining the order of the County Commissioners' Court. Hence, the illegality of the corporate acts already referred to must be regarded as having been cured by the act of 1865. (1 Morawetz on Priv. Corp. sec. 20; *Ill. Grand Trunk R. R. Co.* v. *Cook*, 29 Ill. 237; *Goodrich* v. *Reynolds*, 31 id. 490.)

It is averred in the bill that the road upon which the toll-building stands was originally a public highway. The order of the county commissioners' court, consenting to the appropriation of the highway and made upon the petition of three fourths of the adjoining property owners, merely vested in said corporation "the right to use said highway for the purposes of said plank road." The public has only an easement in a highway, while the fee remains in the owners of the land. The highway continues to be such after it becomes a toll-road. (*Craig* v. *The People*, 47 Ill. 487.) The public still has the right to use the road, but such use is subject to the payment of tolls. The right of the Plank Road Company under the acts already referred to was the right to exact of the public a charge for the use of a mere easement, or right of way over land.

How long could the company under its charter continue to exercise the privilege of exacting tolls and maintaining toll houses?   Section one of the act of 1854 provides that Gray, Filkins, Richmond and their associates are "constituted a body corporate and politic under the name and style of the North-Western Plank Road Company, and by that name *shall have perpetual succession,* and the right to sue and be sued, together with all other rights and ordinary powers of a corporate body." This grant of perpetual succession was an incorporation of the company for an unlimited period of time.   (1 Morawetz on Priv. Corp. sec. 411 and note 3.)   No limit was fixed by its charter for the duration of its corporate existence, and so long as its existence as a corporation lasted, it could continue to exercise the powers conferred upon it.   But, by proceedings under the provisions of the Act of 1865, the Plank Road Company was dissolved in 1870.

The Act of 1865 was not only an act to amend the charter of the company, but also an act "to authorize the sale of the franchise."   Section 3 of this Act provides that "the president, by the advice and direction of a majority of the stockholders, may sell to the county of Cook the franchise, the property and immunities of said company, or to any other party or parties, and *thus dissolve said company,* and divide the avails among the stockholders."   It is quite clear that the intention of the legislature, in authorizing the sale thus provided for, was to dissolve the corporation and put an end to its existence.   Section 5 provides that "the deed of the president of said company to the said county of Cook or to any other party purchasing, shall be a good and lawful title to the same : provided always that all the debts and liabilities of said company shall be paid," etc.

The bill alleges, that the company accepted the amendment of its charter as made by the act of 1865.   It also appears from the recitals in the deed from the president of the company to Amos J. Snell as set forth in the bill, that, at a meet-

ing of the stockholders held in Chicago on January 5, 1866, where all but 80 of the 5120 shares of the stock were represented, a resolution was passed authorizing the president "to sell the plank road, toll-houses and other property belonging to the company, with the franchise and all its rights and privileges, and give a deed of the same to the purchaser," etc. It is then averred, that a sale was afterwards made to Snell, and a deed, dated August 5, 1870, was executed to him by the president of the company. The deed recites that the company is entirely free from debt.

Section 4 of the act of 1865 provides that the supervisors of Cook County may purchase said franchise, property and immunities, "and *should said county fail* to purchase the same, any person or persons may purchase the same and thereby make the same private property." Evidently, the design of the Act was to give the county the right in the first place to obtain a surrender to itself of the privileges granted to the company. The right of other parties to purchase would seem to have been conditioned upon the failure of the county to do so. There is, however, no allegation in the bill, that the county authorities were ever informed of the resolution of January 5, 1866, or were ever given an opportunity of making the purchase referred to in section 4. The only averment upon that subject is that the county did not purchase, but the county supervisors certainly could not be said to have *failed* to purchase, until they were in some way made aware of the action of the stockholders, because such action was a necessary prerequisite to the right of the corporation to sell.

But if it be admitted that the company had the authority to make the sale which it did make to Snell, the question arises, what effect did such sale have upon the company itself and what rights did it confer upon the purchaser?

As the debts were all paid and there were no creditors or third persons, whose rights demanded that the existence of the corporation should be continued, the company became dis-

solved upon the consummation of the sale and the execution of the deed.    This is so, because section 3 states that the object of selling is to dissolve the company.    It is also a general rule, that, where the charter of a corporation, or its franchise to be a corporation, is transferred or sold, there is a surrender or abandonment of the old charter by the corporators.    In the case of such sale or transfer, the effect is the same as though the old corporation was dissolved and its franchise surrendered to the State.    (*State of Ohio* v. *Sherman*, 22 Ohio, 411 ; *Memphis R. R. Co.* v. *Commissioners*, 112 U. S. 609.)    What rights are acquired by the transferees or purchasers ?

It has been said that the essence of a corporation consists in a capacity—1. to have perpetual succession under a special name and in an artificial form ; 2. to take and grant property, contract obligations, sue and be sued by its corporate name as an individual ; and 3. to receive and enjoy, in common, grants of privileges and immunities.    (*Thomas* v. *Dakin*, 22 Wend. 71.)    The first two describe the franchises which belong to the corporators ; the last, those which belong to the corporation. "A corporation is itself a franchise belonging to the members of the corporation ; and a corporation, being itself a franchise, may hold other franchises, as rights and franchises of the corporation."    (*Pierce* v. *Emery*, 32 N. H. 484.)

By the act of 1854 Gray, Filkins, Richmond and their associates became a corporate body with the right of perpetual succession, etc.    This was the franchise of the corporators. By the same act, the corporate body received the right to construct and maintain a toll-road, and to build toll-houses and collect tolls.    These were the franchises of the corporation. The former franchise, that is to say, the franchise to be a corporation, cannot be transferred without express provision of law pointing out the mode in which the transfer is to be made. (*Coe* v. *The Columbus, P. & I. R. R. Co.* 10 Ohio St. 372 ; *Memphis R. R. Co.* v. *Commissioners; supra.*)    The act of 1865 authorizes the sale of "the franchise, the property and immu-

nities" of the Plank Road Company, and specifies that such transfer is to be made by deed of the president. If the word "franchise" as here used is broad enough to include the franchise to be a corporation, with the power of perpetual succession, even then Snell was not thereby made a corporation under the old charter; he was merely vested with the "right to organize as a corporation." (*Memphis R. R. Co.* v. *Comrs. supra.*) But such organization never took place. Neither he nor his heirs or representatives are claiming as the corporate successors of the Plank Road Company. The appellants are claiming as the heirs of Snell, the individual.

"The franchise of becoming and being a corporation, in its nature, is incommunicable by the act of the parties and incapable of passing by assignment." (*Memphis R. R. Co.* v. *Comrs. supra*). If Snell in his life time was the owner of such franchise by express legislative grant, he could not assign it and it could not descend to his heirs. He failed to use it for the purpose of effecting any corporate organization, and it died with him. Even if this were not so, his failure to effect said organization within ten days after the constitution of 1870 went into effect rendered it impossible, under section 2 of article 11 of that constitution, to give any validity to an organization made after the lapse of such period of ten days.

If the franchises, designated as those which belong to the corporation as distinguished from the corporators, passed to Snell by the transfer, and if he had the right to maintain the toll-houses transferred to him and to collect the tolls therefrom, did such franchises and right pass to the appellants at his death? The second proviso of section 5 of the act of 1865 is as follows: "provided further, that the purchaser or purchasers of said franchise and road shall be bound by all the obligations said North-Western Plank Road Company is by its charter, and shall enjoy all the rights and privileges enjoyed by said company and no more." This provision is to be strictly construed in favor of the public and against the grantee of the

privileges in question. (Angell on Highways, section 357; 1 Morawetz on Priv. Corp. sec. 323; *Stormpeltz* v. *The Manor Turnpike Co.* 13 Penn. St. 555). The person, who is to "enjoy all the rights and privileges enjoyed by said company," is stated to be the purchaser of the franchise and road. It is not stated that the purchaser *and his heirs and* assigns shall enjoy such rights and privileges. If it had been the intention of the legislature that the *heirs* of the purchaser should succeed to the privilege of collecting tolls and maintaining toll-gates, it would have been so specified.

The dissolution of the corporation did away with the right of *perpetual succession*, which attached to the corporate body. By neglecting to organize a corporation with such privilege of perpetual succession, if the power to do so passed to him, Snell failed to preserve the element of perpetuity. But if the right to collect tolls and maintain toll-houses descended to his heirs, and by consequence became inheritable by the heirs of such heirs, then there was a continuation of the perpetuity which had been abrogated by the dissolution of the corporation. It is true that the deed made by the president of the corporation to Snell conveys to him, "his heirs, executors, administrators and assigns," but the question is not what the language of the deed was, but what the legislature authorized to be put into the deed.

In *Turnpike Co.* v. *Illinois*, 96 U. S. 63, the Supreme Court of the United States had under consideration a supplement to the charter of a turnpike company, which gave to the company an additional privilege of using a bridge and dyke and erecting a toll-gate on the dyke, and where, as here, no term was expressed for the enjoyment of the privilege, and no conditions were imposed for resuming or revoking it on the part of the State; and Mr. Justice Bradley there said: "It cannot be presumed that it was intended to be a perpetual grant; for the company itself had but a limited period of existence. At common law, a grant to a natural person, without words of

inheritance, creates only an estate for the life of the grantee; for he can hold the property no longer than he himself exists. * * * Grants of franchises and special privileges are always to be construed most strongly against the donee, and in favor of the public." It was decided in *Kœlle* v. *Knecht*, 99 Ill. 396, that the 13th section of our conveyance act has no application to a case like the present, where the privilege of collecting tolls is a mere charge upon an easement owned by the public.

The road certainly did not become "private property" in such sense that the purchaser from the company could manage and control it in the same way and to the same extent as any private property is subject to the use and disposition of the ordinary owner, because we decided in *Craig* v. *The People*, *supra*, that the owner of such a road could not close it up and prevent the public from using it.

The deed to Snell conveys "all the property of said company consisting of the charter and its amendments, and franchises, the right of way, the grading, the planking, ditches, bridges and drainages, the toll-houses, gates, teams, implements of work, *and being the plank road from the old city limits* of Chicago to the nine mile post, together with all the property, goods and chattels of said company of whatsoever nature or description." This language, taken in connection with the allegations of the bill, conveys the impression that, when the sale was made to Snell in August, 1870, the road required to be built by the original charter had not yet been constructed. The obligation imposed upon the corporation as first organized was "to construct a plank road from the city of Chicago to Oak Ridge and from thence to Wheeling and to the north line of said county." The consideration of the contract with the State was that the whole road should be built from the city of Chicago to the north line of the county. There is nothing to show that the State ever released the company from its duty to build and maintain the whole road. It was

28—133 ILL.

not sufficient that it should construct a part. It is true that section 7 of the Act of February 10, 1849, provides that toll may be collected from persons using so much of the road as may be completed, but the privilege of collecting tolls before completion did not excuse the company from the obligation of finally building the whole road.

It clearly appears from the statements in the bill that the original route of the road included the portion thereof that was sold to Snell, and that what he bought did not cover the whole extent of the original route. If it be true, that the road was not yet finished when the sale was made, then Snell was bound to finish it, if all the franchises of the company passed to him. The act of 1865 provides that "the purchaser of said franchise and road shall be bound by all the obligations said North-Western Plank Road Company is by its charter." But it is not alleged in the bill that he ever finished the balance of the road, nor is it pretended that he or his representatives have ever claimed or exercised any control over any part of the road except that named in the deed.

. Upon the assumption that the road was unfinished in 1870, and that, as purchaser of the franchise, he could have proceeded with the construction, it cannot be said that, if he had the right to erect and maintain such toll-houses and toll-gates as he might deem suitable to his interests, such right could have been exercised upon any other part of the road than that constructed by himself. It is distinctly averred in the bill, that the North-Western Plank Road Company had built that part of the road described in the deed to Snell, and had erected thereon toll-gates and toll houses which it deemed suitable to its interests, and had maintained the toll-road, toll-gates and toll-houses and collected "toll therefor and thereat," long before the sale to Snell. This being so, the location of the toll-gates and toll-houses had become established, and the Company had no power to move them or change their location. Tolls can only be collected at the legally established

gates, and the public are interested in the permanency of the location of the gates, and entitled to the right of paying tolls at the established gates, especially when such payments have been made there for a number of years.

By section 7 of the act of February 10, 1849, the company was authorized "to erect and maintain such toll-houses, toll-gates and other buildings for the accommodation and management of the said road and the travel and transport thereon, as the said corporation may deem suitable to its interests." But when the company had once exercised its discretion by locating the gates, then its power was exhausted. (*Griffen* v. *House,* 18 Johns. 397; *State* v. *N. & D. Turnpike Co.* 10 Conn. 157; *Turnpike Society* v. *Hosmer,* 12 id. 361; *H. & D. Turnpike Corp.* v. *Baker,* 17 Pick. 432; *The People* v. *L. & N. R. R. Co.* 120 Ill. 48; Angell on Highways, sec. 360).

When, therefore, the sale was made to Snell, he took the road from the city to the nine mile post with such toll-gates and toll-houses as were already established thereon. He had no more power to change their location than the company had at the time of his purchase. He could only enjoy the rights and privileges enjoyed by the company and no more. The company had the privilege of collecting tolls at the established gates and not elsewhere. He was bound by the obligations which had been imposed upon the company by its charter. One of those obligations was to refrain from changing the location of the toll-houses, or removing them, or building others at other points than those originally selected.

It is alleged in the bill that the toll-gate at the intersection of Milwaukee Avenue with Fullerton Avenue was erected by Snell himself "several years prior to his death," which did not occur until February 8, 1888. The intersection of the two Avenues was upon that part of the toll-road named in the deed. He had no right to locate the toll-gate at the place thus selected. The toll-gates already established had not only been in use for the collection of tolls for years before his purchase,

but for years thereafter. His use of the gates already existing for so long a period of time before the erection of the one in controversy amounted to an acceptance of what had been done by his predecessor, even if he himself had originally had any discretion in the matter of their re-location.

But let it be admitted that the whole road was constructed by the Plank Road Company along the route named in the charter. If this was so, then the charter contemplated the erection of toll-gates and the collection of tolls along the line of the road from the old city limits to the north line of the county. The franchise was one and indivisible. (*The People* v. *Improvement Co.* 103 Ill. 491). The Act of 1865 contemplated the sale of the whole franchise and the whole road. It is manifest that Snell only bought a part of the plank road, nine miles in length, and the franchise of using the same and collecting the tolls thereon. What became of the balance of the road? Was it abandoned, or was it sold to some other purchaser? In either case, there was a division of the franchise authorized to be sold as a whole by the act of 1865. It was not the design of the original charter or of the act of 1865, that there should be more than one ownership of the whole road and all its franchises. The contract between the State and the Plank Road Company was that the company and no one else should construct and keep in repair the whole road and in consideration thereof should collect tolls. The contract between the State and the purchaser named in the act of 1865 was that such purchaser should finish, or if finished, should maintain and keep in repair the whole road, in consideration of collecting tolls thereon. There was no contract between the State and Snell or anybody else, that only a part of the road should be built or kept in repair, or that one part should be kept in repair by the county and the other part by some other owner, or that different owners should maintain and operate different parts of the road.

Therefore, upon the assumption that the whole road had been completed and was in operation on August 5, 1870, it must follow, that the sale made to Snell and the deed executed to him were not in pursuance of the act of 1865, and cannot be regarded as binding upon the State.

The Act of 1865 evidently intended to put the North-Western Plank Road Company upon the same footing with plank roads organized under the general law of the State. Said road, if stone or gravel was substituted for plank, was to be "constructed so as to pass the examination of the inspectors of plank roads" in Cook County. It was to "collect the same tolls and enjoy the same privileges granted to plank road companies by the general plank road law." (*Turney* v. *Wilton*, 36 Ill. 393.) It might collect the same penalties, fines and damages authorized by the general law, and be subject to the same penalties imposed by that law. Words of permission, if tending to promote the public benefit, are obligatory. (Boone on Corp. sec. 36; *Rex* v. *Mayor, etc. of Hastings*, 1 Dowl. & R. 148.) It was promotive of the public benefit that this particular plank road Company should not enjoy any greater privileges than other plank road companies. It accepted the provisions of the Act of 1865, and made sale of its property under the last three sections of that Act. The words "may enjoy the same privileges" will be construed to mean: "shall enjoy the same privileges."

There is nothing in the language of sections 1 and 2 of the act of 1865, which limits the provisions of those sections to the general plank road law as it existed on February 15, 1865. The inspection was to be such as the general law might provide for in the future. The company might collect the same tolls, allowed by the general law as it then was and as it might become by amendment, and could enjoy the same privileges granted to plank road companies by the general plank road law, whether such law should remain the same or be afterwards changed. (*Kugler's Appeal*, 55 Penn. St. 123; *McKnight*

v. *Krinnion*, 22 Mo. 559). By accepting the act of 1865 the North-Western Plank Road Company consented, that thereafter its privileges should be no more nor less than those which the legislature should award to other plank road companies by general law. It consented thereby to accept the same restriction or enlargement, which the general law might make in the privileges of other plank road companies. When Snell made his purchase, he was to enjoy the rights and privileges enjoyed by the company and no more. Therefore, he also was only to have such privileges as should be granted by the general law. (*R. R. Co.* v. *Hecht*, 95 U. S. 168).

The act of March 25, 1874, already referred to, was a general act relating to turnpikes, and plank, gravel, macadamized and other toll roads. We have already seen that, by section 12 of this general law, no toll-gate can be kept or toll demanded within the corporate limits of any city. The toll-gate at the intersection of Milwaukee and Fullerton Avenues is within the limits of a city. Appellants have no right to keep it there, or to demand toll there. Even if the interest of Snell became invested in them as his heirs, they took such interest subject to the same conditions under which their ancestor held it. He only enjoyed the same privilege as to the collection of tolls, which other companies could enjoy under the general law, and the privilege of such other companies was that of collecting tolls outside of the city limits, and not within such limits, nor within 160 rods thereof. Section 12, as applied to the North-Western Plank Road Company, or the purchaser therefrom, cannot be regarded as a violation of its or his contract with the State, in view of the acceptance of the provisions of the act of 1865.

The right to maintain the toll-gate in question is negatived by all the implications from the acts of 1849, 1854 and 1865, and by the general law and policy of this State in regard to the character and powers of incorporated cities.

The road was to be constructed "*from* the city of Chicago," and, although this language has sometimes been construed to mean "from a point within the city," yet such cannot be its construction in the present case. The bill does not so claim, but alleges that the road was begun at the northern limit of the city, as it existed from 1849 to 1854, that is to say, from North Avenue. The charter of the city of Chicago at that time placed its streets entirely under the control of the city authorities. The act of February 10, 1849, authorizes the plank road company to use State roads, and to acquire property from individuals, companies and corporations for the construction of the road; and the Act of March 1, 1854, provides for the use, for such purpose, of highways with the permission of the county and the property owners. But nowhere in any of the Acts is any provision made for locating or constructing the road through any incorporated city or town. An act passed in February, 1851, amending the general plank road law of 1849, provided that no street of a city should be used for a plank road without the consent of the city authorities. An act approved February 21, 1859, providing "for constructing, maintaining and keeping in repair plank, gravel or macadamized roads or pikes by a general law" (Laws of 1859 page 154) —which act was in force when the act of February 15, 1865, was passed—required an agreement with the corporate authorities of a city before any plank-road could be located upon any street of such city. The entire absence of any of these provisions from the acts, which constitute the charter now under consideration, together with the mention of only highways, State roads and private property in such charter, and the complete silence therein as to streets, leads to the conclusion that the contemplated road was intended to be one that should lie entirely outside of the limits of any city. (*Regina* v. *Cottle*, 3 Eng. Law & Eq. 474; *Stormfelz* v. *Manor Turnpike Co. supra; S. & H. Turnpike Co.* v. *Lyons*, 18 Conn. 451; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 419; *Snell* v.

*Buresh*, 123 Ill. 151; *Northwestern Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659; *O. & M. R. R. Co.* v. *McClelland*, 25 Ill. 140).

The policy of this State has always been to give the control of the streets, both as to repairs and general management, to the corporate authorities of the city through which such streets run. The fee of the streets is vested in the city for the use of the public, and their free and untrammeled use belongs to the public. Cities are bodies politic and corporate established by law, not only to regulate and administer their own local affairs, but to assist in the civil government of the country. (1 Dillon on Corp. sec. 19 (9 b)). It can hardly be supposed, that the legislature intended to barter away the right of the State to carry on the government through the organization and extension of cities, by making contracts with toll-road companies for the perpetual control of the public highways. By the natural growth of the country, many of such highways must become, in part at least, streets of cities, and when they are so absorbed by the increase of population, they must be subject to the control of the municipal authorities. Any other result would lead to inextricable confusion. One street cannot be under the management of two distinct governing powers.

The constitutions of 1848 and of 1870 have both been interpreted by this Court to mean, that the legislature has no power to grant to any other than the corporate authorities of a city the right to assess and collect taxes, and that such taxation must be for corporate purposes, and that "the corporate authorities" are those, who are either directly elected by the people of the municipality, or appointed in some mode, to which they have given their consent. (*Wetherell* v. *Devine*, 116 Ill. 631). Whatever may be the rule in other States, it is the settled doctrine of this State, and was the doctrine of the State when the act of 1865 was accepted by the Plank Road Company, that a statute, conferring upon the commissioners of highways the authority to maintain roads within their towns, will not be so construed as to authorize the exercise of such

authority over highways within the limits of a city, and a tax, levied by such commissioners for the repair or improvement of a public road or street lying within the limits of a city, is illegal. (*Town of Ottawa* v. *Walker,* 21 Ill. 605; *Comrs.* v. *Baumgarten,* 41 id. 254; *People* v. *LaSalle County,* 111 id. 527; *People* v. *C. & N. W. R. R. Co.* 118 id. 520). The same principle was applicable when the highways were under control of the counties, as when they were under the control of towns. Counties, under the constitution of 1848, had no more right than towns to maintain a road within the limits of a city, or to levy taxes upon the people of a city for the maintenance of a road or street therein.

When a toll-road was established, the town or county surrendered to the toll-road company the duty of maintaining the highway and keeping it in repair. The toll company was substituted, for that purpose and to that extent, for the authorities of the town or county. Whereas theretofore the county or town levied a tax upon the people, payable either in money or labor, to keep the highway in repair, thereafter the toll-road company required the people to pay tolls for the same purpose. The exaction of tolls from the people was in the nature of a burden or tax just the same as had been the case when the town or county exacted money or labor. Now, it will not be contended, when a city is enlarged so as to include within its boundaries a part of a highway, and so as to make such part of the highway a part of the street, with a fee simple title thereto in the city, that the authority of the town or county over the portion of the road thus taken into the city will continue to exist any longer. It will be admitted that thereafter the city will have entire control. Why does not the same result follow, when the part of the highway, so added to the city, has been under the management of a toll road company? Such company is not a corporate authority of the city selected by the people thereof. It levies upon the people an exaction in the nature of a tax, to which they have never given their

consent. It imposes a charge upon them without their consent for the purpose of keeping in repair one of their own streets, intrusted by the law to the management of their own officials.

Any statute, whose application leads to such a result as is thus indicated, contravenes the spirit, if not the letter, of section 5 of article 9 of the constitution of 1848, and of section 9 of article 9 of the constitution of 1870, as those sections have been interpreted by this court. The legislature had no power in 1849 or 1854 or 1865 to pass a special charter, which could be so used or applied, under a given state of facts, as to violate the fundamental law of the State. The State could not be bound by a contract whose enforcement, under new conditions, would be forbidden by the constitution. It follows that the Plank Road Company and its vendee must be held to have accepted the charter granted to them, upon the implied condition and under the implied understanding that the right to use the highway for a toll-road should give way as to such part thereof as should become subjected, by the growth of the State and its increase in population, to the control and government of an incorporated city. The State had authorized the Company to use the highway by permission of the county upon petition of three fourths of the adjoining property owners, but, under the requirements of the organic law, that use could not continue after the authority of an incorporated city had become substituted for that of the county, and the title of the adjoining property owners, to the land subject to the easement of the highway, had become vested in the incorporated municipality of a city.

We are, therefore, of the opinion that the common council of the City of Chicago had the right to direct its superintendent of public works to remove the toll-gate in question.

The decree of the Superior Court is affirmed.

*Decree affirmed.*