# OPPENHEIMER *v.* PHILADELPHIA, BALTIMORE, & WASHINGTON RAILROAD COMPANY.

STATUTES; RAILROADS; BRIDGES; INJUNCTIONS; NUISANCES.

1. A statute authorizing a railroad company whose tracks run along public streets to extend sidings into adjacent lots should be construed, in doubtful points, against the railroad and in favor of the government or the general public.
2. Under a statute authorizing a railroad company to construct branch tracks or sidings from its lines into any lot adjacent to any street along which its lines are located, for the purpose of enabling lot

owners to use their property for various enumerated business enterprises, the company is not entitled to extend a siding over a street "along which" its main line does not run.

3. Complainants seeking to enjoin the completion of a railroad bridge over and across a street on which their properties abut will not be remitted to a court of law for a determination of the question whether the bridge is an illegal structure, where the existence of the street is admitted and the railroad company seeks to justify its partial occupation under the authority of a statute the proper interpretation of which is disputed. (Distinguishing *Johnson* v. *Baltimore & P. R. Co.* 4 App. D. C. 491).

4. Members of a church, proprietors of stores, and occupants of homes, whose premises abut on a street over and across which a railroad company is constructing, without authority, a bridge forming part of a siding, and who will sustain thereby special and irreparable damage, and will be deprived of the comfortable enjoyment of their properties by reason of the noise, jar, smoke, soot, coal dust, and other like consequences arising from the operation of locomotives and cars over the bridge, are entitled to injunctive relief, where they have pursued their remedy with all reasonable despatch.

No. 2412.    Submitted October 17, 1912.    Decided November 6, 1912.

HEARING on appeal by the plaintiffs from a decree of the Supreme Court of the District of Columbia dismissing a petition to enjoin the construction of a railroad bridge.    *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a decree in the supreme court of the District, sustaining the demurrer of the defendant, the Philadelphia, Baltimore, & Washington Railroad Company, appellee here, and, complainants electing to stand upon their petition, dismissing said petition.

The several complainants are as follows: Solomon Oppenheimer and Louis Kronheimer, partners trading as S. Oppenheimer & Company; Babette Herman, Bella Herman Rosenfeld, Rosa Herman Ney, Blanche Herman Oppenheimer, Geraldine Herman Kronheimer, Selina Herman Ulman, Florence Herman, Leah Herman, Yetta Herman, Isaac Herman, Al-

bert Herman, Bertha Strauss; Charles Schafer, Martin Wie-
gand, Herman A. Rau, and Fred Schieman, trustees of St.
John's Evangelical Lutheran Church; Willard S. Richardson
and Mary Fitzgerald. These complainants seek to enjoin the
completion of a steel plate girder railroad bridge over and across
Four-and-a-half street, opposite square 536. The attached plan
shows the location of said structure: [See next page.]

According to the averments of the petition, the Herman prop-
erties, occupied by the complainants S. Oppenheimer & Com-
pany as a retail store for the sale of clothing, dry goods, etc.,
are located in the southwest corner of square 535, immediately
north of said square 536, and separated therefrom by D street,
said street having a width of 90 feet. Immediately north of
the Herman properties, which have a frontage of 50 feet on
Four-and-a-half street, is lot 40. This lot is improved by a
large brick edifice known as St. John's Evangelical Lutheran
Church, and used by a congregation of that faith as a place of
worship and religious services. The church is represented in
this cause by its trustees. The properties of the other com-
plainants are occupied either as stores or dwellings.

It is further averred that the defendant was, by the act of
February 12, 1901 (31 Stat. at L. 767, chap. 353) as amended
by the act of February 28, 1903 (32 Stat. at L. 909, chap.
856), authorized and required, *inter alia,* to construct and did
construct along Virginia avenue from a point near Delaware
avenue to Seventh street west, an elevated viaduct for its main
tracks and right of way, of the width of four tracks, and was
authorized and required to carry its said four tracks and
right of way across Four-and-a-half street at the intersection
of said street by Virginia avenue, by means of a bridge having
sufficient width for four tracks; that defendant did so con-
struct said bridge and laid its tracks thereon as required; that
the defendant by virtue of said acts acquired, among other
lands, the the ownership in fee of land lying between the north-
erly line of its right of way on Virginia avenue and the south-
erly line of C street south, between Four-and-a-half and Sixth
streets, including that portion of D street which lies between

Four-and-a-half street and Sixth street, and filled the larger portion of said area to the level of its viaduct on Virginia avenue, constructing on the west side of Four-and-a-half street, between Virginia avenue and D street, a masonry wall; that the area thus acquired and filled is known as the "Sixth street yard," and contains numerous tracks and sidings connected with the main line on Virginia avenue; that one of these sidings commences at a point between Four-and-a-half and Sixth streets and about 320 feet west of said Four-and-a-half street, and continues easterly to said masonry retaining wall on the westerly line of said Four-and-a-half street *"at a place about midway between the northerly line of Virginia avenue and the southerly line of D street."* See plan.

The complainants further aver that the defendant is attempting to continue the construction of said last-mentioned siding over and across Four-and-a-half street by means of a steel-plate girder bridge into lot 6 in said square 536, for the purpose, as the complainants are informed and believe, of transporting and dumping into said square large quantities of bituminous or soft coal; that upon learning of the purpose of the defendant to construct said bridge as aforesaid, complainants immediately protested to the commissioners of the District, who, after hearing, refused to revoke the approval theretofore given of the plans of said defendant for the construction of said bridge; that said commissioners were informed by the complainants, and this information the complainants aver was conveyed to the defendant, that resort would be had to the court to prevent the construction of said bridge; that while complainants were perfecting necessary arrangements to institute this proceeding and acting with reasonable diligence, the defendant, with full knowledge of complainants' objections and contentions that the construction of said bridge would be unlawful and of the intent to have such construction enjoined, "on Saturday, the 9th day of September, 1911, late in the afternoon, began the construction of said bridge, and prosecuted said work during that night and during Sunday the 10th day of September, 1911," for the purpose, as complainants believe, of completing said structure

before application could be made to the court to prevent the same; that the construction of said bridge is not completed, temporary wooden supports or false work having been set up in the street to support the plate girders.

It is further averred that the defendant is without lawful right to occupy said portions of Four-and-a-half street with its said structure, which, the complainants aver, is an unlawful obstruction and occupation of a public street, and, as such, is a public nuisance; that said structure is only about 120 feet distant from the property occupied by said Oppenheimer & Company, and "if suffered to be maintained will be a special and irreparable damage to all the plaintiffs, and will permanently depreciate the fee-simple value of the property of those of the plaintiffs who are owners, and be a special inconvenience, damage, and injury to those who are tenants. That in order to operate said siding over said bridge the cars must be propelled by steam locomotives, and because of there being no through passage beyond the part of square 536 into which said siding is to be built, said cars will have to be hauled back and forth for switching, loading, and unloading, coupled and uncoupled, and otherwise handled at that point; that the noise, jarring, smoke, soot, coal dust, and other like consequences from the use of said siding over said bridge will seriously impair the comfortable use of the plaintiffs' property, compel them to keep windows closed in order to keep out the smoke, soot, coal dust, and other dirt, or subject to damage the plaintiffs' household goods and merchandise and the plaintiffs and their tenants to serious discomfort if the windows or doors are left open; that the said conditions and consequences from operating said siding over said bridge will interfere with the comfort of service at said church, and be a permanent injury to the mercantile business of the plaintiffs Oppenheimer & Company, and Richardson; that it would be difficult and impracticable to obtain the redress at law because of the multiplicity of suits which must be brought for such continuing nuisance, and that the plaintiffs are without full, adequate, and complete remedy save by the intervention of this court."

With their petition, complainants filed a copy of the plan of the defendant, showing the location of said Sixth street yard and the relative positions of said squares 535 and 536, the siding proposed to be continued, the location of the bridge proposed to be constructed, and also the orders of the commissioners of the District approving the plan of the defendant for said siding and bridge. We have already reproduced the material part of said plan. The prayers of the petition are that the defendant, its attorneys, servants, and agents be enjoined and restrained from constructing said bridge and for a mandatory injunction requiring defendant to remove all parts of said bridge or structure whatsoever, already erected by it at the point mentioned, and for further relief. To this petition, as previously noted, the defendant demurred.

*Mr. William G. Johnson* for the appellants.

*Mr. Frederic D. McKenney, Mr. John S. Flannery,* and *Mr. William Hitz* for the appellee.

Mr. Justice Robb delivered the opinion of the Court:

It is conceded in behalf of the complainants that if the defendant had a lawful right to construct the bridge as planned, the petition was properly dismissed.

We are therefore confronted, at the threshold of the case, with the question whether the defendant has the right which it seeks to enjoy, and this question is to be determined by an interpretation of the applicable portion of sec. 10 of said act of February 12, 1901 (31 Stat. at L. 767, chap. 353), reading as follows: "And it shall be lawful for said Baltimore & Potomac Railroad Company to extend and construct, from time to time, branch tracks or sidings from the lines of railroad authorized by this act into any lot or lots adjacent to any street or avenue along which said lines of railroad are located, upon the application of the owner or owners of such lot or lots, to enable such owners to use their property for the purposes of

coal, wood, or lumber yards, manufactories, warehouses, and other business enterprises: *Provided, however,* That no grade crossing of any street or avenue within the city of Washington shall be thereby created, but such connecting tracks shall be carried across such street or avenue in such manner as not to obstruct the free use thereof, and the plans of such connecting tracks shall in every case be first filed with and approved by the commissioners of the District of Columbia."

As the petition avers, the line of the defendant's railroad extends along Virginia avenue south of square 536 and across Four-and-a-half street at its intersection by said avenue. Said lot 6 in square 536, it is conceded, is adjacent to Virginia avenue, along which said line of railroad is located. The complainants concede that had the defendant constructed an overhead branch track or siding from its main line on Virginia avenue into lot 6, in such a manner as not to obstruct the free use of the avenue, the structure would have been a lawful one, providing of course that the requisite approval by the commissioners of the plans had been first obtained. They contend, however, that the act in question does not authorize an extension of a siding springing from the main line at a point west of Four-and-a-half street, across Four-and-a-half street, and beyond the limits of Virginia avenue. The contention is that the bridge across Four-and-a-half street does not carry a branch track or siding from Virginia avenue into a lot adjacent thereto, but is an extension of a siding in another square and over a street along which its main line does not run. It is insisted that the plain purpose of the act is to permit the construction of a siding from the *main lines* across the street "along which" such main line runs, directly and immediately into any adjacent lot.

Before proceeding to an analysis of the statute, it may be well to direct attention to the fact that the fee-simple title to the streets of Washington is in the United States, and that no individual or corporation may occupy them, or any portion of them, without the authority of Congress. As these streets are held for and devoted to the use of public travel, the intent of

Congress to encroach upon that use to the benefit of one as against the many must clearly appear.  The rule is thus stated in *Oregon R. & Nav. Co.* v. *Oregonian R. Co.* 130 U. S. 1, 26, 32 L. ed. 837, 842, 9 Sup. Ct. Rep. 409: "It is to be remembered that where a statute making a grant of property, or of powers, or of franchises, to a private individual or a private corporation, becomes the subject of construction as regards the extent of the grant, the universal rule is that in doubtful points the construction shall be against the grantee and in favor of the government or the general public."  The same rule was announced in *Blair* v. *Chicago,* 201 U. S. 400, 50 L. ed. 801, 26 Sup. Ct. Rep. 427, where the court said: "It is matter of common knowledge that grants of this character are usually prepared by those interested in them, and submitted to the legislature with a view to obtain from such bodies the most liberal grant of privileges which they are willing to give.  This is one among many reasons why they are to be strictly construed." In *Warren R. Co.* v. *State,* 29 N. J. L. 353, in which the railroad company sought to justify an obstruction of the street under the act of the legislature conferring its charter, the court said: "No such construction should be given to these words by unnecessary implication.  Public highways ought not to be destroyed, even in part, under pretense of legislative authority, unless it be conferred either by express terms or by necessary implication.  If the words are ambiguous, the construction ought to be in favor of the common right of highway, not against it."

Having in mind the above rule of construction, let us now proceed to an analysis of the language which the defendant contends authorizes the obstruction in question.  The words of the statute are that it shall be lawful for the defendant company to construct branch tracks or sidings "from the lines of railroad *authorized by this act* into any lot or lots *adjacent* to any street or avenue *along which said lines of railroad are located.*"  The purpose of this provision is then declared to be to enable the owners of property so situated along the lines of railroad authorized by the act to use their property for various

enumerated business enterprises. And after declaring this to be the purpose of the act, it is provided that no grade crossing within the city of Washington shall be created, "but such connecting tracks shall be carried across *such street or avenue* in such manner as not to obstruct the free use thereof." The siding in question leaves the line of railroad authorized by the act at a point about 320 feet west of Four-and-a-half street, and leads easterly through land of the defendant to said street. The siding then continues across Four-and-a-half street, "along which" said main line does not run. This, we think, the statute does not permit. Should we rule this structure to be within the terms of the act, it would necessarily follow that a structure across Four-and-a-half street at its intersection with D street, and thence along D street, for the purpose of providing a siding into a lot or lots in said square 536, adjacent to Virginia avenue, would also be within the terms of the act. Indeed, carried to its logical conclusion, the contention of the defendant necessarily results in a construction of the statute which would permit the crossing of any number of streets in the construction of a siding, providing only that the termini of such siding answered the terms of the statute. Such was not the intent of Congress. This legislation, it is stated in the brief of the defendant, had its inception in a recommendation of the commissioners of the District, made in their report to the Senate Committee on the District of Columbia, under date of February 6, 1900, wherein the commissioners "recommended that the company be authorized, upon the petition of the owner or owners of any lot or lots adjacent to the line of its railway, to run branch tracks or sidings into such lot or lots, provided, of course, that no grade crossings are created thereby." This recommendation, as we read it, as well as the statute which it inspired, is of a purely local character. Both speak of "any lot or lots," and neither of any square. The privilege conferred is not general, that is, a privilege to be enjoyed by the public at large. On the contrary, its benefits are confined to those having a lot or lots adjacent to the right of way of the defendant. Presumably Congress believed that inasmuch as four lines of

tracks already ran along the street to which the lots mentioned in the act were adjacent, it would do no particular harm to permit a siding to be run from that right of way into such adjacent lots. Such a siding, if constructed in accordance with the provisions of the act, would probably have little effect upon property in squares more remote from the railroad's right of way, whereas a siding crossing or traversing a street along which said right of way does not extend might injuriously affect property in squares that would be little affected by the running of trains over the right of way. The present case proves the pertinency of these suggestions. Had this siding entered from Virginia avenue and been confined exclusively within the limits of that avenue, it would have been so remote from the complainant's premises that probably little, if any, injury would have resulted to complainants. As we have suggested, if the siding in its present location is authorized by the act, it would be equally within the terms of the statute if it crossed at a point opposite D street, at the very doors of complainants' premises. That this suggestion is not fanciful is apparent from an inspection of said plan, for the Sixth street yard of the defendant extends north of D street, and hence it was simply a question of expediency whether to cross Four-and-a-half street at the point in question or farther north.

It may be suggested that under the construction we have adopted it might be impossible to extend the benefits of this act to all lots adjacent to the railroad's right of way. Even so, a construction ought not to be adopted which may work harm to those who, in no event, would receive any benefits. If any lot is so located that it may not be entered by a siding constructed in accordance with the provisions of the act, it is the misfortune of the owner. If he desires permission to occupy a portion of the public streets not within the terms of this act, he must seek authority from Congress. It is our duty to construe, and not to make, laws. The construction we have adopted comports with and gives effect to the real purpose of the statute. Moreover, it is definite and leads to no uncertainty or conjecture. The construction contended for by the defendant

is so ambiguous that difficulty would be certain to be experienced in giving it effect.

It is insisted by the defendant that complainants have no standing in a court of equity until it has been determined in a court of law that the bridge in question is an illegal structure. To sustain this contention counsel cite *Irwin* v. *Dixon*, 9 How. 10, 13 L. ed. 25. In that case the complainant alleged that he was the owner of a warehouse fronting, "on the east, the River Potomac, and the doors and windows of said front open on a strand, which has been used uninterruptedly as a public highway for upwards of thirty years," and sought an injunction to prevent the defendant from building a fence in a portion of said strand or public street. In his answer the defendant claimed as his own property the land upon which the fence was to be erected, and denied that such fence would constitute an obstruction, "in any appreciable degree," of the light of the windows of the complainant. Many exhibits and much testimony were introduced. The court held that the gravamen of the action was "the obstruction of a public highway where a fence runs," and, later in the opinion, observed: "And when the right or title to the place in controversy, or to do the act complained of, is, as here, doubtful and explicitly denied in the answer, no permanent or perpetual injunction will usually be granted, till such trial at law is had, settling the contested rights and interests of the parties." The court, however, notwithstanding that the existence of the highway was in dispute, proceeded to a full consideration of the evidence bearing upon that point, and found that the ground upon which the fence was to be built was private property, and not a public street.

In *Parker* v. *Winnipiseogee Lake Cotton & Woollen Co.* 2 Black, 545, 17 L. ed. 333, the complainant failed to state in his bill how the injury was produced and in what it consisted. The court observed: "We have looked carefully into the evidence upon the subject; the result is, that we are left in doubt upon which side lies the truth. We have failed to find those clear facts of rights upon one side, and wrong upon the other, which are necessary to quicken into activity the powers of a

court of equity." The court was careful to qualify its ruling in the case by the following: "It [a court of equity] will also give its aid to prevent oppressive or interminable litigation, or a multiplicity of suits, or where the injury is of such a nature that it cannot be adequately compensated by damages at law, or is such as, from its continuance or permanent mischief, must occasion a constantly recurring grievance, which cannot be prevented otherwise than by an injunction."

*Johnson* v. *Baltimore & P. R. Co.* 4 App. D. C. 491, also cited by the defendant, is very similar in its facts to *Irwin* v. *Dixon,* supra. The existence of the highway which the complainant alleged was being constructed was in issue. The complainant had waited for several years before instituting his suit and, as the court found, the nature of the injury suffered, if any, was such that adequate compensation could be had in an action at law.

In the present case there are no disputed questions of fact, the existence of the highway which, it is alleged, the bridge in question obstructs, being admitted. The defendant seeks to justify its partial occupation of this highway under authority of said act of 1901. The interpretation of that statute is a question for judicial determination, and, if determined adversely to the defendant, the bridge is *per se* a public nuisance, as is any other unauthorized obstruction of a public street. No reason is apparent why, if conditions entitling complainants to be heard in this forum are present, they should be remitted to a court of law to have said act of 1901 interpreted.

We are now brought to the question whether complainants have stated a case entitling them to the relief sought. It has long been the rule that a bill in equity to abate a public nuisance lies at the instance of one who has sustained, or will sustain, special damages. "The private party sues rather as a public prosecutor than on his own account; and unless he shows that he has sustained and is still sustaining individual damage, he cannot be heard. He seeks redress of a continuing trespass and wrong against himself, and acts in behalf of all others who are or may be injured." *Mississippi & M. R. Co.* v. *Ward,* 2 Black,

485, 492, 17 L. ed. 311, 314.   After setting forth the proximity
of their property to this obstruction, complainants aver that
they will sustain special and irreparable damage if it is suf-
fered to be maintained; that it will permanently depreciate the
fee-simple value of the property of those who are owners, and
be a special inconvenience, damage, and injury to those who are
tenants; that to operate said siding over said bridge cars must
be propelled by steam locomotives, and cars hauled back and
forth for switching and unloading, coupled and uncoupled; that
the noise, jar, smoke, soot, coal dust, and other like consequences
from the use of said siding over said bridge will seriously im-
pair the comfortable use of the plaintiff's property, compel them
to keep windows closed in order to keep out the smoke, etc.,
and "will interfere with the comfort of service at said church."
These averments are admitted by the demurrer.   Upon demurrer
we cannot say that these averments of special damage and in-
jury are not likely to be realized; in other words, we are unable
to say that the anticipated injuries will not naturally result from
the maintenance of this unlawful structure.   The members of
this church, the proprietors of these stores, and the occupants of
these homes, have the right to the comfortable enjoyment of
their property (*Baltimore & P. R. Co.* v. *Fifth Baptist Church,*
108 U. S. 317, 27 L. ed. 739, 2 Sup. Ct. Rep. 719), and, owing
to the character of the injuries alleged and the number of the
complainants, the preventive force of a decree in equity, re-
straining the illegal acts before any mischief is done, clearly
affords a more efficacious and complete remedy than would be
had should the complainants be remitted to their several actions
at law.   *Missouri* v. *Illinois,* 180 U. S. 208, 244, 45 L. ed. 497,
513, 21 Sup. Ct. Rep. 331.

In *Vicksburg Waterworks Co.* v. *Vicksburg,* 185 U. S. 65,
46 L. ed. 808, 22 Sup. Ct. Rep. 585, the damages complained
of were anticipated, as here.   The court said: "But it is one
of the most valuable features of equity jurisdiction, to antici-
pate and prevent a threatened injury, where the damages would
be insufficient and irreparable."   See also: *Craig* v. *People,* 47
Ill. 487; *Clowes* v. *Staffordshire Waterworks Co.* L. R. 8 Ch.

125, 42 L. J. Ch. N. S. 107, 27 L. T. N. S. 521, 21 Week. Rep. 32; *Chapman* v. *Rochester,* 110 N. Y. 273, 1 L.R.A. 296, 6 Am. St. Rep. 366, 18 N. E. 88; *Broome* v. *New York & N. J. Teleph. Co.* 42 N. J. Eq. 141, 7 Atl. 851.

As the petition shows that the complainants moved with all reasonable despatch, the demurrer should have been overruled. The decree will therefore be reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion.                                         *Reversed.*