THE FLORIDA EAST COAST RAILWAY COMPANY, A CORPORATION, *Appellant*, v. THE CITY OF MIAMI, A MUNICIPAL CORPORATION, *Appellee*.

## Opinion Filed August 13, 1918.

1. In construing a contract no word contained in it is to be treated as a redundancy if any meaning reasonable and consistent with other parts can be given to it.

2. In a contract in which the terms "put in, operated and maintained" are used, each described a separate and distinct act or class of acts and neither means exactly the same as the other, and no one of them can be rejected as surplusage.

3. A City has the right to purchase a right-of-way over the lands of a railroad company. It may pay for the same in cash, or it may be in consideration of the benefits which the city derives from the opening of a street over the railroad company's land take upon itself the expense of affording protection to persons and property using the street.

4 Where a City receives from a railroad valuable property rights which it could not have taken without just compensation, and also received other and greater benefits in the removal of switching operations from the heart of the City to several miles distant, for which the only consideration on the part of the City was that it would bear the expense of operating police and mechanical guards at the crossing, such obligation on the part of the City is not a contract to barter away its police power.

5. A contract between a City and a railway company whereby the latter in consideration of the City bearing the expense to put in, operate and maintain a street crossing, grants to the City a right-of-way over its property for such street, is not a bartering or contracting away of the police power of the City.

Appeal from Circuit Court for Dade County; H. Pierre Branning, Judge.

Decree reversed.

*Armstead Brown* and *Shutts, Smith & Bowen,* for Appellant;

*Hudson, Wolfe & Cason,* for Appellee.

BROWNE, C. J.—This is a suit brought by the Florida East Coast Railway Company against the city of Miami to have an ordinance of the city which required all railway companies operating any line of railway along and over certain streets in the city of Miami, to provide and maintain and properly operate safety gates for the protection of persons from trains and locomotives approaching the crossings of said streets, declared null and void, insofar as it requires the complainant to provide, maintain, and operate safety gates at the crossing on Eleventh Street, and for an injunction restraining the defendant, its officers, agents and servants, from taking any action to enforce the ordinance insofar as it applies to the complainant, and to restrain the defendant from taking any action to compel it to provide, maintain and operate safety gates at the crossing at Eleventh Street.

A demurrer to the bill was sustained and the bill dismissed, and the complainant brings the cause to this court on appeal.

The bill alleges that for many years prior to the 3rd of September, 1914, the complainant was the owner in fee simple of a right-of-way one hundred feet wide in the city of Miami at a point where, if extended, the street known as Eleventh Street would cross its right-of-way "on which right-of-way there were located at and in close proximity to said point, certain railroad tracks, yards and station facilities, for the movement of locomotives and trains, both freight and passenger, for the switching of cars, etc., one of said tracks thereon located being the main line of your orator's railway between Jacksonville, Florida, and Key West, Florida, and the platform of orator's passenger station, extended across where said Eleventh Street if extended would intersect said right-of-way; that this, and adjoining portions of complain-

ant's right-of-way were utilized for certain of orator's railroad operations, and on account of these operations being carried on in such close proximity to the business portion of the city of Miami, the City Council of said city desired the removal of certain of its operations from this portion of said right-of-way and was desirous of securing the opening of said Eleventh Street as an important public thoroughfare of said city, across what was at that time private railway property, free from any easement for public use as a street or highway, and which was being put to such use for station and railroad purposes as to make it very doubtful whether said city could, by condemnation proceedings or other legal process, compel your orator to submit to the opening and extension of said Eleventh Street across the same."

"That to remove its through freight operations, its coaling facilities and the said portion of its passenger station platform from their then location, described in the preceding paragraph, and to relocate and establish the same, with its yards and other facilities, so as to comply with the desire of said City Council, and to make practicable the opening up of said Eleventh Street through said right-of-way would require the expenditure of large sums of money by the Railway Company."

The bill in substance further alleges that after some negotiations between the authorities of the city of Miami and the officers of the complainant company, an ordinance was adopted by the City Council on September 3rd, 1914, in which it was stated that in consideration of a deed of dedication by the railway company over its right-of-way necessary to the extension of Eleventh Street across the same, and other considerations therein mentioned, it was provided that the crossing to be put in at Eleventh Street should be "put in, operated and

maintained without expense" to the railway company; that within thirty days from the passage of the ordinance the complainant filed its written acceptance of it, and that by thus accepting the ordinance it became a binding contract between complainant and the city of Miami.

That within fifteen months after the adoption of the ordinance the complainant in fulfillment of its contract with the city, executed and delivered to the city of Miami a deed of dedication for street purposes in the extension of Eleventh Street, a right-of-way of the width of Eleventh Street as then established across complainant's property, being 50 feet north and south, and 100 feet east and west; the deed provided that in accordance with the ordinance the crossing should be "put in, operated and maintained without expense" to the railway company, and subject to its unrestricted use for tracks and railway purposes, which deed of dedication was delivered to and accepted by the city, and Eleventh Street opened up by the city across the railway's right-of-way, and, in recognition of the obligation resting upon the city under the ordinance and deed of dedication, "to put in, operate and maintain without expense" to the railway company the crossing at Eleventh Street, the city after opening Eleventh Street across the right-of-way and constructing the crossing, employed a watchman at the crossing at the expense of the city.

That the city is now seeking to compel the railway company to put in, maintain and operate safety gates at the crossing of Eleventh Street which has been dedicated by the railway for street purposes.

Then follow averments to show the complainant's right to invoke the aid of a court of equity, and wherein the ordinance, the operation of which the bill seeks to enjoin, is illegal and void.

All phases of the case have been elaborately discussed by counsel on both sides, but the case hangs on two propositions: the meaning of the word "operate" as used in the contrace, and the power of the city to enter into a contract to pay the expenses of operating the appliances and safeguards which are usually operated at crossings on much used streets in thickly populated cities.

The biill and exhibits which by apt words were made a part of the bill, show that the city desired to extend Eleventh Street over and across the railway's right-of-way, and that to do this it not only had to cross its tracks and yards but a part of the platform of the passenger station, and that the city was also desirous for the removal of the operations of the railway and the movement of the locomotives and trains and the switching of its cars from such close proximity to the business portion of the city, and in order to secure these very substantial advantages, and acquire the right to open Eleventh Street over the railway's right-of-way, it enacted an ordinance which when accepted by the railway became a contract between the railway and the city, and while there were certain mutual concessions, the principal one, and the one now under consideration, was that such crossing was "to be put in, operated and maintained without expense" to the railway company.

It appears from the bill that the city put in, maintained and also operated the crossing for a time without expense to the railway, but in March, 1916, it sought by ordinance to require the railway company to bear the expense by providing, maintaining and operating safety gates.

The city contends that in construing the contract, the word "operate" should be rejected as mere surplusage. If a vital word upon which a contractual obligation rests

may be treated by the courts as surplusage, there would be an end to the dignity and solemnity of contracts. Against the contention of the city, however, is the well settled rule of construction that no word in a contract is to be treated as a redundancy, if any meaning reasonable and consistent with other parts can be given to it. 9 Cyc. 583; Randel v. Chesapeake & Del. Canal Co., 1 Harr. (Del.) 151; World's Fair Hotel Bureau v. Courtright, 57 Ill. App. 281; Rolland v. McCarty, 19 La. 77; Heywood v. Heywood, 42 Me. 229.

The first question presented is the construction of the word "operate" as used in the ordinance of September. 3rd, 1914. The city advances the argument that the word "operate" is an active verb and has no meaning in connection with a street crossing, or a street, and that a "street is not a machine or anything tangible which can be operated, and that it is a mere passable space over which things in operation move, and that a street or a street crossing cannot move or operate or be operated, and that the word "operate' in the ordinance is without effective meaning, and does not put upon the city of Miami the burden of maintaining at the crossing, gates or watchmen which may be necessary for the protection of the public from the dangers incident to the operation of railway trains over the street." We find on investigation, that the word "operate" has been used by the courts with regard to streets and roads in the very sense which the appellee contends it cannot be used, and such use is common in connection with toll roads and turn-pike roads to express the meaning which the railway contends should be given to the words "put in, maintain and operate" in the contract. A reference to a few of the cases will show its use in this sense. In Snell v. City of Chicago, 133 Ill. 413, 24 N. E. Rep. 532, 8 L. R. A.

858, the court says, there was no contract that "different owners should maintain and operate different parts of the road." Again, "Therefore upon the assumption that the whole road had been completed and was in operation on August 5th, 1870."

"The prayer is, that defendant be restrained from operating its turn-pike, and not from building it." Board of Internal Improvements of Lincoln County v. Stanford & Logan Creek Turnpike R. Co., 91 Ky. 291, 15 S. W. Rep. 782.

"The petitioner constructed said toll road under the provisions of our statute, and since that time has continuously operated the same." Southern Development Co. of Nevada v. Douglass, 26 Nev. 230, 66 Pac. Rep. 66.

"The authority of the police juries with respect to the construction and management of toll road is as broad as that which concerns the establishment of such roads, and they may build, maintain and operate such roads directly, or they may contract with others, whether corporations or individuals, for their construction, maintenance and operation."

Again, "There can be no doubt that the plank road is a vital necessity and it is not denied that it has been maintained and operated, with occasional intervals as a toll road." In the ordinance which the court was considering in that case we find this language: "And said company is hereby authorized to operate, maintain and control a plank road, etc." St. Joseph Plank Road Co. v. Kline, 106 La. 325, 30 South. Rep. 854.

The ordinances, legislative enactments or contracts by which toll roads are established use language of the same import as that used in the ordinance under consideration. The toll roads are to be built, maintained and operated, as the crossing at Eleventh Street was to be "put

in, maintained and operated." To put in or build a road or crossinging, means to construct it; to maintain it, means to keep it up; to operate it, means to put in and use such appliances and employ such persons as are necessary to the purposes for which the road or crossing is to be used.

To operate a turnpike or toll road means to put in gates or bars, if necessary, and to employ the services of some one to open and close the same, and collect the tolls from parties using the road. To operate a crossing means to put in safety' gates or bars with the necessary help to operate them or the stationing of a watchman to warn persons when it is unsafe to use the crossing, and inform them when they may do so with safety.

Each of the terms used in the ordinance under consideration describes a separate and distinct act or class of acts, and neither means the same as the other. In McChesney v. Village of Hyde Park, 151 Ill. 634, 37 N. E. Rep. 858, the court says, "The word 'operate' does not mean the same thing as either the word 'construct.' the word 'maintain' or the expression 'keep in repair' and is not included in the significations of either."

In the contract between the city of Miami and the Florida East Coast Railway, the word "operate" had a distinct meaning and was used for a definite purpose, and imposed upon the city an obligation to do everything with regard to the crossing, necessary for the public safety, without expense to the railway company. The use of gates or the employment of watchmen are essential to the safety of the public at a railway crossing on a much traveled street, and their use constitutes the operation of the crossing. The officials of the railroad company knew that if they permitted the city to open Eleventh Street its right-of-way, it would entail certain

expenses, such as—the original cost of construction, which they covered by the term "put in;" the upkeep, which they covered by the word "maintain;" and the expense of opening and closing gates, or employing a watchman, which they covered by the word "operate." It is difficult to find a word better suited to include all expenses that might be incurred by means of the use of the crossing. If the city had stipulated to pay the expense of opening and closing the gates, or for the employment of a watchman, it might not have covered improved methods for the protection of persons and property using the crossing, which it might from time to time have desired to substitute for those in use when the contract was made; so the word "operate" was used to cover all present or future methods, appliances or adjuncts, which experience might demonstrate to be expedient or proper to be used at a street and railway crossing.

We are next confronted with the question, whether the city in contracting to operate the crossing without expense to the railway company was an abdication of the police power of the municipality and illegal and void. The protection of public health, public morals and public safety is a duty which the State owes to its inhabitants, and they have authorized it to do such things as are necessary for the performance of this duty; it is a sacred trust, and the police power is derived from the necessities of its execution. It is well settled that the State cannot divest itself by contract or otherwise of its police power, but we do not think the case presented here has that aspect. The fallacy in the contention of appellee grows out of its conception of the police power, as the means of paying for protection, rather than protection itself; thus making the payment the main purpose, and public health, morals and safety, mere incidents.

We think there is a clear distinction between a contract by the State in reference to a matter within reach of the police power, and a contract to suspend or divest itself thereof.

The Supreme Court of the United States has indicated that it recognizes the distinction in this language: "While we are not prepared to say that the Legislature can make a valid contract on no subject embraced in the largest definition of the police power, we think that, in regard to two subjects so embraced, it cannot, by contract, limit the exercise of these powers to the prejudice of the general welfare. These are the *public health* and the *public morals*. The preservation of these is so necessary to the best interests of social organization that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health and the repression of crime." Butchers' Union Slaughter-House Co. v. Crescent City Live-Stock Landing Co., 111 U. S. 746, 4 Sup. Ct. Rep. 652.

It is worthy of note that Mr. Justice MILLER drew a distinction between contracts affecting "public health and public morals" and those affecting "public safety," and that while he condemned contracts which limited the exercise of the power to protect public health and public morals, to the prejudice of the general welfare, the question of a State obligating itself for a valuable and sufficient consideration, to pay certain expenses which might be incident to the preservation of the public morals and the protection of the public health, was not involved.

Can it be said, that by the contract between the city of Miami and the Florida East Coast Railway, the city has limited the exercise of its police power to the prejudice of the general welfare? We do not think so. The city has in no wise limited the exercise of its police pow-

er, but, on the contrary, is exercising it, and if it performs its duty to the public will continue to do so. There is nothing in the contract whereby the city divests itself of its duty to insure the safety of persons using the crossing. The contention of the appellee that because the city relieved the railway of the expense of operating the crossing in consideration of a grant from the railroad by which the city acquired the right to extend Eleventh Street over the railroad's right-of-way, it divested itself of its power to protect the public, is not sound.

We fail to see wherein there is any surrender of its police power by the city by putting in, operating and maintaining the crossing; on the contrary, it is exercising its police power when it does this. The question of who pays the expense does not determine whether or not it is a surrender or bartering away of such power.

Traffic on the streets in large cities is controlled by virtue of the State. In handling it appliances are used at street crossings to indicate when all traffic movement must cease and when it may proceed. Employees of the city operate these appliances and regulate the traffic. On some streets surface cars and auto bus lines are operated, which bear none of the expense of handling the traffic except as is borne by all taxpayers. Can it be said that a city is not exercising its police powers for the protection of persons and property in thus regulating traffic, merely because it bears the expense, instead of placing it directly on those using the streets? A city, under its police power, could enact a toll from every person, street car, or bus using a street-crossing where it was necessary to maintain appliances and station employees for the public safety, but may also in lieu of collecting such tolls from street cars and buses, contract

for a valuable consideration, to relieve them from paying tolls for each trip. Such a contract would not be bargaining away the city's right to exercise its police power, although it would be in relation to a matter which the city in the performance of its duty to the public has ample police power.

In the instant case the city of Miami received from the railway, valuable property rights which it could not have taken from it without just compensation. It also received other and greater benefits by the removal of the switching operations, the station and tracks from within the heart of the city, to four or five miles distant. The city when it entered into this contract with the railway was no doubt satisfied that it had received ample consideration from the railway for what it agreed to give in return—the expense of operating the crossing.

· Numerous illustrations suggest themselves to show that a contract such as this is not one by which the city divests itself of its police power. Thus where there was a tract of land within the corporate limits of a city, on which were mosquito breeding ponds, marshes and heavy undergrowth, the city under its police power could require the owners to keep the ponds and marshes drained, and the undergrowth kept down, but if the owner were to convey this property to the city for use as a public park, and the city in consideration thereof should contract to keep the ponds drained, and marshes drained and undergrowth kept down, without expense to the owner, it would be clearly within its powers, and such a contract would not be a surrender or bartering away of its police power or its rights to exercise the same. Nor would the city be permitted after taking possession of the property and converting it into a public park, to repudiate its part of the contract to keep the prop-

19—Vol. 76.

erty drained, and while retaining possession of the property and enjoying the benefits therefrom, require the owner to bear that expense. If the city should subsequently abandon the park and restore the property, it might afterwards require him to bear the expense of keeping it drained, but that question is not presented here, as the city of Miami does not propose to return the street, and from the nature of the acts which have been performed by the railway in accordance with the obligation of its contract, the parties can not now be restored to the situation in which they were before the contract was entered into.

It does not appear that the facts in the case of State ex rel. City of Minneapolis v. St. Paul, M. & M. R. Co., 98 Minn. 380, 108 N. W. Rep. 261, relied on by the appellee, were the same as those in the instant case, and cannot, therefore, be taken by this court as conclusive on this subject. In that case if the railroad company had owned all the land over which new streets were to be opened, and had granted the lands to the city for street purposes on consideration that the city should bear the expense of constructing and maintaining all crossings and approaches, a conclusion in accord with the decision in this case would probably have been reached.

A later case, and one in accord with justice and good conscience, City of Chicago v. Chicago & Western Indiana R. Co., 174 Ill. App. 452, is in harmony with the conclusion reached by us. In that case, the court said, "And while it is true that a municipal government 'as a representative of the State' cannot, by a contract, 'surrender or alienate a strictly governmental function, which it is required to continue in existence for the welfare of the public' (City of Chicago v. Chicago Union

Traction Co., 199 Ill. 259, p. 270) it is equally true that a municipal corporation may be equitably estopped, not indeed by mere lapse of time, but by circumstances which make it unconformable to right and justice, from exercising a power over the use and management of some particular highway which would otherwise fall within its police powers considered in their broadest aspect.

"This is the doctrine adopted by our Supreme Court in cases like Chicago, R. I. & P. R. Co. v. City of Joliet, 79 Ill. 25; Chicago & N. W. R. Co. v. People, 91 Ill. 251; Martel v. City of East St. Louis, 94 Ill. 67, and City of Chicago v. Sawyer, 166 Ill. 290; and these decisions are in harmony with the general course of decisions in other jurisdictions."

The Northern P. R. Co. v. State of Minnesota *ex rel.* City of Duluth, 208 U. S. 583, 28 Sup. Ct. Rep. 341, is much relied on by the appellee. In that case the obligation of the railroad company existed *before* the contract or compromise agreement was entered into. The obligation to construct viaducts over its tracks and keep them in repair, was a pre-existing one.

The distinction between the Duluth case and the one at bar is a vital one. In the former there was an existing obligation on the part of the railroad at the time the contract was made whereby the city surrendered its power to compel the railroad to fulfill its obligation. In the instant case, no such obligation existed prior to the making of the contract. As long as the railroad owned the land and there was no street over it, it owed no duty, and the city had no rights to be surrendered by the contract.

In the Duluth case Lake Aevnue had been dedicated for street purposes, when in 1869 the railroad laid its first tracks across it. The city did not get its right to

extend the street over and across the railroad tracks, from the railroad. The police power over the street existed before the railroad was built over it, and before the contract was entered into. In the instant case the railroad was built and was in operation for a number of years before it granted to the city for a valuable consideration the right to open a street over its property and until the railroad granted to the city a right-of-way there was no traffic to regulate.

When the City of Duluth made the contract to pay part the expense of building the viaduct and to maintain for fifteen years the part of the bridge over the railway's right-of-way and perpetually maintain the approaches, it already had the power to require the railroad to bear all this expense, and it contracted away an existing power and obligation to the public. On the contrary, as long as the property through which Eleventh Street was extended by the City of Miami remained private property, the city had no police power over it, and none existed to be contracted away.

The Duluth case can only be regarded as analogous to the instant case by confusing the facts in the two cases; the Duluth case deals with and is confined to the question of laying out streets over lands which the city had the right to use for street purposes independent of its contract with the railroad; and in the instant case the city had no right to extend Eleventh Street, except as it acquired that right by its contract with the railroad. In the Duluth case, the contract was entered into *after* the city had acquired its right; in the instant case the city had no right, until after the making of the contract.

None of the Minnesota cases discussed in the Duluth case deal with a situation like this, where the power of

the city to extend Eleventh Street was acquired by the contract with the railroad. In the Minnesota cases the city's right to open or extend the streets existed prior to and independent of the contract, which contracts were not, as in this case, for the acquisition of property, but for the protection of the public in the use of streets over which the city already had rights, or which it acquired subsequently from a source other than the railroad.

The fallacy in applying the Duluth case and others along the same lines to the facts in the instant case, arises from a failure to distinguish between a contract by a city to acquire property and property rights and to enter into an obligation in consideration thereof, and a contract to barter away an existing power.

In the Duluth case, the court said: -'The right to exercise the police power is a continuing one," and a thing to be "continuing" must be pre-existent. The City of Miami did not have the police power now sought to be exercised over this property as long as the railroad owned it, and until the railroad conveyed to the city the right to open a street across its property there was no police power to be continued.

In most, if not, all the cases on this subject, there has been a question about what was the contract between the city and the railway, or there was a direct surrender of its right to exercise its police power for the protection of public morals, public health and public safety. In the instant case there is no dispute about the contract except what was meant by the word "operate," and there is nothing in the contract by which the city surrenders its power to protect public health, morals or safety, but, on the contrary, the contract requires the city at its expense for a valuable consideration to exercise its police

power in protecting the public safety at a dangerous point.

While the contract requires the city to meet the current expenses of operating the crossing, the railroad gave to the city what the latter regarded at the time, and which we think was, a good and valuable consideration for its subsequent outlay.

The city makes no contention that the contract was unfair, unjust or inequitable. It makes no charge that the railroad has not fully, fairly and promptly performed its part of the contract. It merely says, that notwithstanding what we obligated ourselves to do; notwithstanding the benefits which we have received from the railroad in return for our solemn promise, we ask the court to extend the doctrine which prevents the surrender of the exercise of the police power beyond the purpose of the doctrine and relieve us of our obligation. A City Council in the aggregate sometimes does thing which the persons who compose it would not do in their individual capacity, thus trying to maintain a double consciousness which divides the man and the official. A higher civic ideal will be reached, and better civic righteousness established if this distinction is not accepted or approved.

We think the Chancellor erred in sustaining the demurrer and dismissing the bill and dissolving the temporary injunction, and the decree is therefore reversed.

TAYLOR AND ELLIS, J. J., concur.

WHITFIELD AND WEST, J. J., dissent.

WHITFIELD, J., *dissenting.*—By contract stipulations the railroad company "dedicated" to the city for street

purposes a right of way "over and across the right of way and property" of the railroad company, for the extension of a street of the city, one of the provisions being that "such crossing to be put in, operated and maintained without expense to the railway company, and subject to the unrestricted use thereof by the railway company, for its tracks and railroad purposes." Subsequently the city adopted an ordinance which requires the railroad company to "maintain and properly operate safety gates of a design mechanism suitable for the protection of persons riding, driving or on foot, from the trains and locomotives approaching said crossing."

A bill brought to enjoin the city from enforcing the latter ordinance was dismissed and the railroad company appealed.

The question presented is whether the "dedication" provisions unlawfully abrogate the police power of the city.

Municipalities cannot in general barter away their police powers involving the public safety and welfare; and contracts made by municipalities should not be construed to abrogate the right of a city to exercise its police powers unless they were clearly so intended. The subject-matter of the contract provisions was the "dedication" for street purposes of a right of way across the right of way and tracks of the railroad company, and not police protection of the public at the crossing; and the provision that "such crossing to be put in, operated and maintained without expense to the railway company" was apparently not intended to enlarge the subject-matter of the stipulations. As used the word "operated" does not preclude the city in the exercise of its police power and duty to protect the public from risks of injury at a crossing of a railroad track by a city street, from

requiring the railroad company to "maintain and properly operate safety gates * * * suitable for the protection of persons * * * approaching said crossing." Gates are required to protect those using the street from injury by trains, the use of the streets, not the moving of trains being impeded by using the gates. The operation of the railroad is subject to reasonable municipal regulations required by the growth of the city; and the police power and duty of the city to make and enforce lawful regulations cannot be abrogated by contract.

WEST, J., *dissenting.*—If the ordinance by which the city of Miami undertook to put in, operate and maintain a crossing over the right of way and tracks of the appellant railway company was intended to perpetually bind the city to put in and maintain safety gates or such appliances as are necessary to protect the public from the dangers incident to the use of such crossing, without expense of such railway company, it was in my opinion beyond the power of the city to adopt, and is therefore not binding upon it.

The opinion holds that: "In the contract between the city of Miami and the Florida East Coast Railway, the word 'operate' had a distinct meaning and was used for a definite purpose, and imposed upon the city an obligation to do everything with regard to the crossing, necessary for the public safety, without expense of the railway company. The use of gates or the employment of watchmen are essential to the safety of the public at a railway crossing on a much traveled street, and their use constitutes the operation of the crossing."

If this duty was legally "imposed upon the city," then necessarily the city was perpetually bound to withhold the exercise of the power, commonly called the police

power, which it clearly possesses, to require the railway company at its own expense and without expense to the city to put in, operate and maintain such safety appliances.

It is well settled that under its police power the State may establish all regulations that are reasonably necessary to secure the health, safety, good order or general welfare of the community; that this power cannot be abdicated nor bargained away and that all contracts and property rights are held subject to its proper exercise. Atlantic Coast Line R. Co. v. City of Goldsboro, North Carolina, 232 U. S. 548, 34 Sup. Ct. Rep. 364; Chicago, B. & Q. R. Co. v. People of State of Illinois ex rel. Drainage Com'rs, 200 U. S. 561, 26 Sup. Ct. Rep. 341; New Orleans Gas Light Co. v. Drainage Commission of New Orleans, 197 U. S. 453, 25 Sup. Ct. Rep. 471; Chicago, B. & Q. R. Co. v. City of Chicago, 166 U. S. 226, 17 Sup. Ct. Rep. 581.

Now the maintenance of proper safety appliances at the crossing are duties which the city may in the exercise of its police power, in the interest of the public safety, require the railway company to perform without compensation (State ex rel. Village of Clara City v. Great Northern Railway Company, 130 Minn. 480, 153 N. W. Rep. 879; Cincinnati, I. & W. R. Co. v. City of Connersville, 218 U. S. 336, 31 Sup. Ct. Rep. 93), and when the city obligates itself to withhold the exercise of this power, with respect to such duties, and itself assumes the obligations and burdens of "operating" the crossing it has to that extent abdicated the power possessed by it to require such railway company, without compensation, to put in and maintain such "safety gates" as public necessity and convenience may require.

In case of Great Northern Railway Company and Willmar & Sioux Falls Railway Co. v. State *ex rel.* Village of Clara City, U. S.    , Sup. Ct. Rep.    , April 15, 1918, the court said: "It is too well settled by former decisions of this court to require extended discussion here, that railroad companies may be required by the States, in the exercise of the police power, to make streets and highways crossed by the tracks of such companies reasonably safe and convenient for public use, and this at their own expense.    Such companies accept their franchises from the State subject to their duties to conform to regulations, not of an arbitrary nature, as to the opening and use of the public streets for the purpose of promoting the public safety and convenience."

The case under consideration is squarely within the rule announced by the Supreme Court of the United States in the case of Northern P. R. Co. v. State of Minnesota *ex rel.* City of Duluth, 208 U. S. 583, 28 Sup. Ct. Rep. 341.

That was a case in which the railway company was required by mandamus pursuant to the provisions of a resolution of the governing body of the city of Duluth, in which the avenue was located, to repair a certain viaduct carrying the railway company's tracks over a certain avenue.    The city and the predecessor of the railway company had entered into an agreement by which the railroad was to contribute to the expense of the construction of the viaduct the sum of $50,000.00, and the city agreed to maintain for fifteen years the part of the viaduct over the railroad's right of way and to perpetually maintain the approaches.    The city constructed the viaduct and in addition to the $50,000.00 contributed by the railroad the city expend $23,000.00 in its construction.

Before the expiration of the fifteen-year period the city, upon the theory that the railroad should maintain the viaduct at its own expense, repudiated the agreement and brought mandamus proceedings to require the railroad to repair it.  In an elaborate opinion in which many authorities are referred to the Supreme Court of Minnesota (State *ex rel.* City of Minneapolis v. St. Paul, M. & M. R. Co., 98 Minn. 380, 108 N. W. Rep. 261) upheld the contentions of the city.  This judgment was affirmed by the Supreme Court of the United States in an opinion prepared by Mr. Justice DAY, and because of the peculiar aptness of the language employed and the striking similarity of the questions considered to the questions involved here, I quote at length from that opinion:

"As the Supreme Court of Minnesota points out in the opinion in 98 Minnesota, 380, above referred to, the State courts are not altogether agreed as to the right to compel railroads, without compensation, to construct and maintain suitable crossings at streets extended over its right of way, after the construction of the railroad  The great weight of State authority is in favor of such right. (See cases cited in 98 Minnesota, 380).

"There can be no question as to the attitude of this court upon this question, as it has been uniformly held that the right to exercise the police power is a continuing one; that it cannot be contracted away, and that a requirement that a company or individual comply with reasonable police regulations without compensation is the legitimate exercise of the power and not in violation of the constitutional inhibition against the impairment of the obligation of contracts.  In *New York and New England Railway Company* v. *Bristol,* 151 U. S. 556, 576, the doctrine was thus laid down by Chief Justice Fuller, speaking for the court:

" 'It is likewise thoroughly established in this court that the inhibitions of the Constitution of the United States upon the impairment of the obligation of con. tracts, or the deprivation of property without due process, or of the equal protection of the laws, by the States, are not violated by the legitimate exercise of legislative power in securing the public safety, health and morals. The governmental power of self-protection cannot be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied · liability to governmental regulations in particulars essential to, the preservation of the community from injury. *Beer Co.* v. *Massachusetts,* 97 U. S. 25; *Fertilizing Co.* v. *Hyde Park,* 97 U. S. 659; *Barbier* v. *Connolly,* 113 U. S. 27; *New Orleans Gas Company* v. *Louisiana Light Company,* 115 U. S. 650; *Mugler* v. *Kansas,* 123 U. S. 623; *Rudd v. New York,* 143 U. S. 517.'

"The principle was recognized and enforced in *Chicago, Burlington* & *Quincy R. R. Co.* v. *Chicago,* 166 U. S. 226, where it was held that the expenses incurred by the railroad company in erecting gates, planking at crossings, etc., and the maintenance thereof, in order that the road might be safely operated, must be deemed to have been taken into account when the company accepted its franchise from the State, and the expenses incurred by the railroad company, though upon new streets, might be required as essential to the public safety. In *Detroit Railroad Co.* v. *Osborne,* 189 U. S. 383, it was held that the State of Michigan might compel a street railroad to install safety appliances at an expense to be divided with a steam railroad company occupying the same street, notwithstanding the steam railroad was the junior occupier of the street. The subject was further under consideration in *New Orleans Gas Light Co.* v. *Drainage*

*Commission of New Orleans,* 197 U. S. 453, where it was held that although the gas company had permission from the city to lay its pipes under the streets, it might be required to remove the same at its own expense, in the exercise of the police power in the interest of the public, in order to make way for a system of drainage which was required, in the interest of the public health, without compensation to the gas company; and that uncompensated obedience to regulations for public safety under the police power of the State was not a taking of property without due process of law.

"The same principles were recognized and the previous cases cited in *Chicago, Burlington & Quincy Ry Co.* v. *People of the State of Illinois ex rel. Drainage Commissioners,* 200 U. S. 561, and again in *Union Bridge Co.* v. *United States,* 204 U. S. 364. The result of these cases is to establish the doctrine of this court to be that the exercise of the police power in the interest of public health and safety is to be maintained unhampered by contracts in private interests, and that uncompensated obedience to laws passed in its exercise is not violative of property rights protected by the Federal Constitution.

"In this case the Supreme Court of Minnesota has held that the charter of the company, as well as the common law, required the railroad, as to existing and future streets, to maintain them in safety, and to hold its charter rights subject to the exercise of the legislative power in this behalf, and' that any contract which undertook to limit the exercise of this right was without consideration, against public policy and void. This doctrine is entirely consistent with the principles decided in the cases referred to in this court. But it is alleged that at the time this contract was made with the

railroad company it was at least doubtful as to what the rights of the parties were, and that the contract was a legitimate compromise between the parties, which ought to be carried out. But the exercise of the police power cannot be limited by contract for reasons of public policy, nor can it be destroyed by compromise, and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the State or the municipality to abrogate this power so necessary to the public safety. *Chicago, Burlington & Quincy R. R. Co. v. Nebraska ex rel. Omaha*, 170 U. S. 57."

This holding has been expressly reaffirmed in the following cases: St. Paul, Minneapolis & M. R. Co. v. State of Minnesota *ex rel.* City of Minneapolis, 214 U. S. 497, 29 Sup. Ct. Rep. 698; Chicago, M. & St. P. R. Co. v. City of Minneapolis, 232 U. S. 430, 34 Sup. Ct. Rep. 400; Great Northern Railway Company and Willmar & Sioux Falls Railway Co. v. State *ex rel.* Village of Clara City *Supra.*

The police power is one of the inherent powers of government; and it can not be abdicated nor contracted away. As we have seen "it is beyond the authority of the State or municipality to abrogate this power so necessary to the public safety." This being true it cannot be said that because the railway company in this case paid to the city, in the way of a "dedicated" right of way across its tracks a consideration for said ordinance and the obligations assumed by the city thereunder, the city is bound by the contract and can not now question its validity. The city by the ordinance requiring railroad companies to put in safety gates at crossings, the enforcement of which the appellant seeks to enjoin, simply denies, the validity and binding force of the provision

of the former ordinance imposing this duty upon the city, as to the crossing under consideration.

Besides, it is well settled that one who contracts with a municipal corporation must inquire into the power of the corporation to make a contract and the railroad company in this case was therefore chargeable with notice of the absence of power in the city to make the contract which it now insists shall be enforced.

It may be that since the consideration recited in the deed of "dedication" is not such as the city was authorized to give for the easement therein granted and conveyed, that the city may by appropriate proceeding be required to pay for such easement, but that is an altogether different proposition from asserting that because of such recited consideration the city shall not be permitted by ordinance, in the exercise of its inherent government powers to require the railway company to maintain at such crossing such safety appliances as are necessary to secure the public safety.

The provision here considered of the ordinance referred to as a contract being outside the powers of the city to legally adopt and therefore of no validity and binding force, it was perfectly competent for the city to adopt and enforce the latter ordinance.

There is no question of civic righteousness involved here, but with the construction given by the majority opinion to the city ordinance under consideration, the vital principle of whether or not a municipality in this State may bind itself by contract to withhold the exercise of inherent governmental powers which it possesses and should exercise to secure the safety and general welfare of its citizens, in my opinion, is involved.